Eugene A. BROADHEAD, Receiver and Statutory Liquidator for the State Board of Insurance in the State of Texas for Mission National Insurance Co., and International Insurance Company, Plaintiffs,

v.

HARTFORD CASUALTY INSURANCE COMPANY and Hartford Accident & Indemnity Company, Defendants and Cross–Claimants,

v.

Bryan D. PIERI, et al., R.K. Webb, et al., and Indemnity Marine Assurance Company, Ltd., et al., Defendants and Cross–Defendants,

Dan Pierce and Pierce Petro–Management, Inc., d/b/a Pierce Petroleum, Intervenors,

Tomlinson Interests, Inc., Republic Refining, Ltd., and Gary J. Knostman, Intervenors.

Civ. A. No. J86–0667(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

April 16, 1991.

Suzanne N. Saunders, Sheila R. Fortenberry, Jackson, Miss., Bryon, Nelson Randolph, Land & Weathers, Hattiesburg, Miss., for Eugene Broadhead.

Lawrence C. Gunn, Jr., Hattiesburg, Miss., David Ringer, Florence, Miss., for Dan Pierce, etc.

Edmund L. Brunini, Jr., Chris Shapley, Jackson, Miss., for Tomlinson, Knostman & Republic.

Winston Edward Rice, Rice, Fowler, Kingsmill, Vance & Flint, New Orleans, La., for Ins. Companies and Underwriters Cert. No. 35120.

Daniel A. Goforth, Randy W. Williams, Goforth & Lewis, Houston, Tex., for Tomlinson, Republic Refining & Knostman.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

### THE INCIDENT AND COVERAGES

Tomlinson Interests, Inc. (Tomlinson) operated the E.N. Ross #2 Well located in the Johns Field in Rankin County, Mississippi.[1] Republic Refining, Ltd. (Republic), a Tomlinson subsidiary, operated a gas plant nearby to process the sour gas produced by Tomlinson's wells.[2] On July 15, 1985, there was an above-ground blowout of the Ross #2 well. At the time of the blowout, Tomlinson and Republic had comprehensive general liability coverage under several insurance policies issued by Hartford Accident & Indemnity Company and Hartford Casualty Insurance Company (collectively Hartford), as follows:

Hartford Policy No. 61 CESSA0639, issued to Tomlinson, was the primary policy which provided liability coverage in limits of $500,000 for bodily injury and $100,000 for property damage (hereinafter Tomlinson primary or 0639);

Hartford Policy No. 61 CESSA0642, issued to Republic providing comprehensive general liability coverage of $500,000 for bodily injury and $100,000 for property damage (hereinafter Republic primary or 0642);

Hartford Policy No. 61 HUNV 1261, issued to Republic and which listed Tomlinson as an additional insured for drilling activities in the Johns Field, was an umbrella policy providing liability limits of $1,000,000 (hereinafter Republic umbrella or 1261);

Hartford Policy No. 61 HUNV 1262, issued to Tomlinson, provided liability limits of $5,000,000 (hereinafter Tomlinson umbrella or 1262).

A first layer of excess umbrella coverage was provided Republic, and by endorsement, Tomlinson, by Mission National Insurance Company's (Mission) policy number MN038651, which furnished $4,000,000 coverage in excess of the Hartford policies 0642 and 1261. International Insurance Company (International) provided a second layer of excess coverage through its policy 522 6145 2 which had policy limits of $10,000,000 in excess of the underlying Mission policy.[3] In addition, Tomlinson had well control and redrill/replacement coverage under two certificates of insurance, numbers 35120 and 34595, subscribed to by certain insurance companies and Underwriters at Lloyd's London (Underwriters).

### ENSUING LITIGATION

Following the blowout, a number of Rankin County residents who lived in the vicinity of the well filed suits in Rankin County Circuit Court against the Estates of Tomlinson and Republic, and Dan Pierce and/or Pierce–Petro Management (Pierce),[4] a con-

---

1. Tomlinson filed for protection under the United States Bankruptcy Code in Texas in June 1984, following which the trustee, Gary J. Knostman, conducted all business affairs of Tomlinson, including the drilling of the E.N. Ross #2 Well.

2. Republic is also a debtor in Chapter 7 proceedings in the Houston Bankruptcy Court. Gary J. Knostman is its court-appointed trustee.

3. Republic carried $150,000,000 worth of liability coverage for its exposure in the Johns Field.

By endorsement to the Republic umbrella policy issued by Hartford to name Tomlinson as an additional named insured, Tomlinson received the benefit of Republic's coverage. Thus, there were in effect additional policies but as those policies are not pertinent to the present controversy, they need not be set forth in detail.

4. Dan Pierce and his company, Pierce–Petro Management, will be referred to collectively as Pierce.

tractor hired by Tomlinson to perform consulting services on the well, among others, seeking to recover for bodily injury and property damage, and for loss of use of their property as a result of the escape of hydrogen sulfide and other toxic gases. These lawsuits, which were consolidated under Master Cause Number 15,002, were ultimately settled for the sum of $1,665,283, evidenced by an October 16, 1986 agreed judgment between Tomlinson and the plaintiffs.

Upon entry of the agreed judgment, Hartford, which had defended Tomlinson in the case, paid $1,065,283 toward satisfaction of the judgment, leaving $600,000 unpaid. Hartford claimed that the Tomlinson umbrella policy, 1262, did not apply to the loss and that its payment of $1,065,283 had exhausted the coverage available under its policies. Hartford advised Tomlinson by letter dated December 22, 1986 that because the policy limits were exhausted, Hartford would no longer defend it.[5]

In September 1986, Roxani Gillespie, then conservator for the insolvent Mission,[6] and International Insurance Company, the insurance carriers which provide coverage in excess of that provided by Hartford, brought the present action pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, seeking, among other things, a declaratory judgment that coverage under Hartford's policies had not been exhausted and that therefore, the policies issued by Mission and International were not yet activated. Plaintiffs alleged that the underlying coverage was not exhausted as Hartford had wrongfully added insureds,

including Pierce, after the loss occurred and had paid benefits on behalf of Pierce and other additional insureds and thereby had depleted funds available under Hartford's policies to be used on behalf of actual insureds. Plaintiffs requested an order that Hartford recredit to the available policy proceeds all sums paid by or on behalf of Pierce, or any other person or entity who was not an insured prior to the loss. International also sought a declaration that it had no duty to "drop down" to substitute its policy limits for the coverage provided by Mission, which was insolvent, so as to prevent a gap in coverage.

Pierce was permitted to intervene in this cause by order of January 27, 1987, and on March 23, 1989, asserted a counterclaim against Mission and International and a crossclaim against Hartford seeking a declaration that Pierce is an insured under the primary and umbrella policies issued by Hartford to Tomlinson as well as the International excess policy. Pierce also alleged entitlement to attorney's fees from International for being forced to intervene and defend in this action as a result of International's taking the position that Pierce was entitled to no coverage under any of the policies at issue.

While this case was pending, Tomlinson, on October 31, 1986, brought suit in the United States Bankruptcy Court for the Southern District of Texas seeking to establish that it continued to have coverage under Hartford's policies, *In re: Tomlinson Interests, Debtor, Gary J. Knostman, Trustee for Tomlinson Interests, Inc., et al. v. Hartford Casualty Insurance Com-*

---

5. The December 22, 1986 letter from Jim Napper, Hartford's claims manager, advised that Hartford had settled claims against the insureds under policy 0639, the Tomlinson primary policy, and the Republic umbrella policy, 1261. Napper stated:

> [T]hese policies each provide that Hartford's duty to defend ceases when the policy coverage had been exhausted through payment of judgements or settlements. Therefore, the Hartford will, effective immediately, cease bearing responsibility for cost of defense of any litigation against any of its insureds on account of the blowout of the gas well in the Johns Field in Rankin County, Mississippi, whether suit has been filed or not.

6. Mission was placed in conservatorship in the State of California in December 1985. In February 1987, Mission was placed in liquidation in California and Texas. An order of a Texas state court was entered July 16, 1987 cancelling all contracts and policies of insurance issued by Mission to Texas insureds, effective August 15, 1987. An order adopting James Odiorne as the permanent receiver for Mission in Texas was entered on October 5, 1987; thereafter, by order dated January 31, 1989, Stephen S. Durish was substituted as Receiver and Statutory Liquidator for the State Board of Insurance for the State of Texas for Mission. Subsequently, Eugene A. Broadhead was substituted as Ancillary Receiver and Statutory Liquidator.

*pany and Hartford Accident and Indemnity Company,* Case No. 84–03173–HS–7. Hartford responded with a request that the bankruptcy court reform the Tomlinson umbrella policy to exclude coverage of Tomlinson's exposure in the Johns Field. After being advised by Hartford on December 22, 1986 that Hartford was taking the position that policy 1262 did not cover Tomlinson's Johns Field operations and would no longer defend lawsuits against it, Tomlinson sought and obtained from the bankruptcy court a preliminary injunction, enjoining Hartford from abandoning its defense of lawsuits filed and pending against Tomlinson and prohibiting Hartford from denying coverage under policy 1262.

Tomlinson and Republic thereafter, on February 20, 1987, intervened in this suit, contending, as in the bankruptcy court action, that its coverage under the Hartford policies had not been exhausted and that Hartford therefore remained obligated to defend and pay claims against Tomlinson. Tomlinson claimed entitlement to recover from Hartford certain costs allegedly incurred as a result of the blowout, including post-blowout evacuation expenses and costs associated with lost and damaged equipment, and additionally asserted claims against Hartford for punitive damages based on various alleged actions and inactions by Hartford in connection with Tomlinson's claims under Tomlinson's umbrella policy. Hartford filed a counterclaim against Mission, International, Tomlinson and Pierce seeking an adjudication that it was not liable under policy 1262 for payment of Tomlinson's claims and was under no further obligation to defend Tomlinson, or any other insured, by virtue of exhaustion of the primary coverage.

When, upon motion by Hartford, Underwriters were joined in the action, Hartford filed a crossclaim seeking to hold the Underwriters liable for any damages awarded to Tomlinson on its claim against Hartford for post-blowout expenses. Hartford later amended its crossclaim seeking an additional declaration that Underwriters were and are obligated to defend Tomlinson in all landowner actions (past, present and future) and that Underwriters are therefore liable for all sums expended by Hartford in Tomlinson's defense of Master Cause 15,-002 and all additional costs that have been expended or will be expended in defense of landowner suits. Further, Hartford sought to recover from Underwriters all sums which Hartford paid in settlement of Master Cause 15,002. Tomlinson, likewise, asserted a crossclaim against Underwriters seeking recovery of the evacuation costs originally sought only against Hartford, as well as a declaration that Underwriters had a duty to defend Tomlinson in Master Cause 15,445 and any landowner suits which might be filed in the future.

In addition to its claims against Mission, International, Tomlinson and Underwriters, Hartford filed a crossclaim against Pierce claiming that while Pierce was properly treated as a named insured under the Tomlinson and Republic umbrella policies, no coverage was provided under policy 1262 as that policy was not intended to cover the Johns Field operations. Hartford claimed, therefore, that it owed no duty to defend Pierce and sought to recoup from Pierce any and all costs which Hartford had expended in defense of Pierce following exhaustion of policies 0639 and 1261. Pierce, in turn, filed a claim against Hartford alleging that Pierce was insured under each of the Hartford policies, and demanding that Hartford be permanently enjoined to defend and indemnify Pierce in all third-party lawsuits arising out of the blowout until the aggregate limits of all the Hartford policies were reached. Pierce also alleged that Hartford had acted in bad faith, apparently in having attempted to abandon its defense of Pierce. Finally, Pierce claimed entitlement to recover attorney's fees from Hartford for Pierce's being forced to defend Hartford's claims in this case.

On September 10, 1987, the Houston Bankruptcy Court submitted proposed findings of fact and conclusions of law and a proposed final order to the federal district court in Houston. A hearing was scheduled for June 7, 1988 for Hartford's appeal of the bankruptcy court's preliminary injunction, but Hartford sought and obtained

a stay of the Texas proceedings pending the outcome of this litigation. Recently, however, that stay was lifted and the Texas District Court entered its order substantially affirming the actions of the bankruptcy court.[7]

In July 1987, while this action was pending, the plaintiffs in Master Cause 15,002, in an effort to recover the outstanding $600,000 balance of the agreed judgment entered in that cause, filed separate garnishment actions against Hartford and Underwriters in state court. The cases were removed to this court. In *Jones v. Southern Marine & Aviation Underwriters*, 739 F.Supp. 315 (S.D.Miss.1988), this court concluded that Underwriters, pursuant to the terms of their policy and the agreed judgment, were relieved of all liability to the landowner plaintiffs for any part of the agreed judgment and accordingly entered summary judgment for Underwriters. That decision was affirmed by the Fifth Circuit. *Jones v. Southern Marine & Aviation Underwriters*, 888 F.2d 358 (5th Cir. 1989).

Hartford, in response to the landowner plaintiffs' garnishment efforts in *Jones v. Hartford Accident and Indemnity Company*, 714 F.Supp. 808 (S.D.Miss.1989), sought reformation of policy 1262 on the basis of an alleged mistake in preparing the policy, contending that the parties to that insurance contract had intended to exclude Tomlinson's Johns Field operations from coverage under the policy but had erroneously failed to do so.[8] Tomlinson, Republic and Gary J. Knostman, as bankruptcy trustee for Tomlinson and Republic, intervened in that action requesting a declaratory judgment that Tomlinson's um-

brella policy did provide coverage for the blowout and thus covered the balance of the unsatisfied judgment. Following a trial before Judge William H. Barbour of the issues presented, the court found, by opinion dated August 25, 1989, that Hartford's policy 1262 provided coverage for the blowout. The court denied Hartford's claim for reformation, granted Tomlinson's request for declaratory relief, and awarded the landowner plaintiffs a judgment against Hartford for $600,000, representing the balance of the state court agreed judgment.[9] The Fifth Circuit, by unpublished opinion, affirmed that decision. *Jones v. Hartford Accident and Indemnity Company*, 915 F.2d 1567 (5th Cir.1990).[10]

While litigation over the coverage issues was taking place in this court, additional landowner suits were filed and are now pending in the Rankin County Circuit Court, commenced in October 1987 and consolidated under Master Cause Number 15,-445. Discovery is ongoing in those proceedings, and there has to date been no resolution of that action and Hartford has continued to provide a defense for Tomlinson in those proceedings.

MOTIONS

There are presently before the court numerous motions by the parties to this action, which can be briefly described as follows:

Hartford's Motion for Summary Judgment seeks judgment as follows:

(a) that the actions taken by Hartford on behalf of Pierce in defending and indemnifying Pierce as a named insured under its primary policy were proper under its insurance agreement;

---

7. The Opinion on Interlocutory Judgment and Interlocutory Judgment of the Texas district court are attached hereto as Appendix A.

8. Hartford asserted that after the loss, it discovered that its two umbrella policies, policy 1261 which was issued to Republic, and policy 1262 which was issued to Tomlinson, both purported to provide coverage for Tomlinson's Johns Field operations. Upon this realization, Hartford in September 1986 issued a formal endorsement excluding the Johns Field from Tomlinson's excess policy, based on Hartford's claimed intention that the Johns Field should have been ex-

cluded from coverage under policy 1262 since Tomlinson was an insured under Republic policy 1261. Hartford thereafter sought reformation of the policy to reflect what it claimed was the intent of the parties.

9. The Bench Opinion and the Final Judgment entered thereon in *Jones v. Hartford* are attached hereto as Appendix B.

10. The Fifth Circuit's opinion in *Jones v. Hartford* is attached hereto as Appendix C.

(b) that it is under no duty to continue defending any insured since its policy limits have been exhausted and that it has no duty to defend Tomlinson or Republic since the excess policy makes defense optional;[11]

(c) that none of the policies issued by Hartford covers the "post blow-out" expenses claimed by Tomlinson; and

(d) that because Judge Barbour stated that the ruling on the mutual mistake matter was a "close call," Hartford had a legitimate and arguable reason for denying Tomlinson's claim and thus it could have no punitive damages liability.

Tomlinson's Motion for Partial Summary Judgment Against Hartford seeks:

(a) a determination that the claims of third parties seeking amounts for equipment damaged or destroyed in the blow-out are insured under Hartford's umbrella policy and that Hartford is required to defend and insure all of those claims;

(b) recovery of attorney's fees and litigation costs incurred in defending Hartford's reformation action before Judge Barbour, and attorney's fees incurred in connection with its pending motions.

Tomlinson's Cross–Motion for Summary Judgment Against Hartford seeks an adjudication in its favor as follows:

(a) under both the primary and umbrella policies, Hartford is obligated to reimburse Tomlinson for post-blowout evacuation expenses incurred by Tomlinson which Tomlinson was "legally obligated to pay as damages;"

(b) Hartford has a continuing duty to defend Tomlinson and is estopped from abandoning its defense of Tomlinson under the umbrella policy; and

(c) this court should refrain from interfering with the injunction issued by the Texas bankruptcy court requiring Hartford to defend Tomlinson against all lawsuits involving claims arising out of the blowout of the Ross # 2 Well.[12]

International's Motion for Summary Judgment requests:

a declaration that its policy is not required to "drop down" in place of the policy issued by the now insolvent Mission.

Pierce's Motions for Partial Summary Judgment seek an adjudication that:

(a) Pierce is an insured under the Hartford policies, including Tomlinson's umbrella policy;

(b) Pierce is entitled to coverage from International;

(c) Hartford and International should be required to pay Pierce's attorney's fees for having to intervene in this action; and

(d) that Hartford's policy limits have not been exhausted because the incident giving rise to the claim for injuries against Pierce, the blowout, was not just one occurrence, as that term is defined in the policy, but rather amounts to multiple occurrences, each occurrence giving rise to a new claim and new liability under the Hartford policy.

Underwriters' Motion for Summary Judgment Against Hartford requests a declaration that:

(a) they had no duty to defend Tomlinson in Master Cause 15,002 and have no duty to defend Tomlinson in Master Cause 15,445; and

(b) they are not liable for payments made by Hartford pursuant to the agreed judgment in Master Cause 15,002.

**TOMLINSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT; HARTFORD'S MOTION FOR SUMMARY JUDGMENT AND TOMLINSON'S CROSS–MOTION FOR SUMMARY JUDGMENT**

By its motion for summary judgment, Hartford seeks a determination that it is under no duty to continue defending any insured since its primary policy limits are exhausted and that it has no duty to defend

---

11. As to Tomlinson, this issue has been rendered moot by the recent ruling of the Texas district court.

12. Issues (b) and (c) of Tomlinson's cross-motion have been rendered moot by the recent order of the Texas district court.

Tomlinson or Republic under the umbrella policy since the excess policy makes defense optional, that none of the policies issued by Hartford to Tomlinson cover the post blow-out expenses claimed by Tomlinson, and that it is entitled to summary judgment on Tomlinson's punitive damages claim against it. Tomlinson has responded to Hartford's motion with a cross-motion for summary judgment on the issues raised by Hartford. Tomlinson has additionally moved for partial summary judgment, asking this court to adjudicate that all claims for damage to, destruction of or the loss of use of equipment not owned by Tomlinson are insured under the umbrella policy and to enjoin Hartford to defend and acknowledge responsibility for such claims. Tomlinson also seeks damages from Hartford for equipment claims paid by Tomlinson which, under the terms of the umbrella policy, should have been paid by Hartford. Further, Tomlinson seeks an order requiring Hartford to reimburse Tomlinson for the attorney's fees and costs incurred by Tomlinson in defending Hartford's reformation claim, and in pursuing its motion for partial summary judgment.

Conflicts Issue

To determine the coverage issues presented by these motions, the court must decide whether Mississippi law or Texas law governs. Hartford contends that Mississippi law applies; Tomlinson asserts that Texas law applies. Both parties recognize that in a diversity action, the district court is bound to apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Moore v. United Services Auto. Ass'n,* 808 F.2d 1147, 1150 (5th Cir.1987). Mississippi utilizes a "center of gravity" approach to the resolution of conflicts issues. *Mitchell v. Craft,* 211 So.2d 509, 512 (Miss.1968). Thus, this court's conflicts analysis begins with the premise that the law of the state which has "the most substantial contacts with the parties and the subject matter of the action" applies, *Boardman v. United Services Auto. Ass'n,* 470 So.2d 1024, 1031 (Miss.1985);

the applicable law, though, is not necessarily the same for all issues and thus the court must separately analyze each issue under the center of gravity test, *id.* The Mississippi conflicts rules in the context of insurance contracts were set forth in *Boardman.* There, the court recognized that the *Restatement (Second) of Conflict of Laws* § 188 identifies a number of factors pertinent to the determination of what law applies in contract cases generally: (a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the residence, place of incorporation and place of business of the parties. The policies in question were negotiated and executed in Texas, and were issued by Hartford in Texas to Tomlinson, a Texas corporation and provided coverage for risks located in Texas, Louisiana and Mississippi.

Regarding insurance contracts specifically, the *Restatement (Second)* § 193 provides, as a rule of general applicability, that "where the greater portion of the risk be in a particular state for the major portion of the insurance ..., the risk's principal location is the most important choice of the applicable law." The *Boardman* court, though, recognized an exception to this general rule, holding that the more general §§ 6 and 188 apply when the issue concerns coverage under the policy:

The outcome-determinative question here, however, appears to be one of coverage.... This is a matter having little to do with the location of the risk. This coverage question invokes the exception to the general "principal location of the insured risk" rule of *Restatement* § 193. In our view, the coverage issue tendered here is an issue unrelated to the insured risk, as a result of which the choice of law determination must be made by reference to the more general principles of *Restatement* § 6 and § 188, for here we are concerned with the meaning of the insurance contract....

*Boardman,* 470 So.2d at 1033–34. Hartford acknowledges in its brief in support of its motion for summary judgment that the issues currently before the court vis a vis Tomlinson are mainly matters of interpret-

ing the policy and applying the facts to determine coverage.[13] In the court's opinion, it is abundantly clear that Texas law governs the coverage issues presented.[14]

Equipment Claims

■ When the Ross # 2 Well blew out, the hydrogen sulfide fumes were ignited to convert the gas to less toxic sulfur dioxide. The burning gas caused the destruction of oil field equipment rented to Tomlinson and to equipment owned by others working for Tomlinson on the well. Numerous equipment owners have sought recovery from Tomlinson for the damage to and destruction of their equipment. In this action and by its present motion, Tomlinson claims entitlement to a declaratory judgment that the third-party equipment claims are insured under Tomlinson's umbrella policy and injunctive relief against Hartford requiring Hartford to defend and insure such claims. Pretermitting for the moment consideration of Tomlinson's claim regarding Hartford's defense obligations, the court will first address Tomlinson's contention that the claims by third parties for damage or destruction to equipment on and around the well site are covered under the umbrella policy. The general coverage provision of policy 1262 reads as follows:

the company will pay on behalf of the **insured * ultimate net loss** in excess of the total applicable limit (as stated in the Extension Schedule of the **Underlying Insurance Policies**) of **underlying insurance** or the amount of the **self-insured retention** when no **underlying insurance** applies, because of ... **property damage**

**13.** In the duty to defend portion of its brief, Hartford states that "all the court can consider in deciding whether there is a duty to defend is the insurance policy and the law."

**14.** The court notes that Article 21.42 and 21.43(a) of the Texas Insurance Code indicate that Texas law should apply:

21.42. Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed

... to which this insurance applies, caused by an **occurrence**.

Under policy 1262, "ultimate net loss" is defined as "all sums which the insured and his or her insurers shall become legally obligated to pay as damages, whether by final adjudication or settlement with the company's written consent after making a proper deduction for all recoveries and salvages collectible." The policy defines "property damage" as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

In support of its claim for equipment damages, Tomlinson has submitted the affidavit of Darrell Bell, Tomlinson's accounting/insurance manager, wherein Bell sets forth the various claims for which payment is sought under the umbrella policy.

A number of the claims presented by the equipment owners to Tomlinson for payment are currently pending in the bankruptcy court in Houston. As to these claims, no lawsuit or adversary proceeding has been filed against Tomlinson:

| | |
|---|---|
| Derek Mfg. Inc. | $ 51,510.00 |
| Dia–Log Co. | $ 6,190.00 |
| Edd Oil Co. | $ 4,800.00 |
| Mid–South Detection & Control | $ 4,960.80 |
| National Fire Exting. Co. | $ 4,770.00 |
| Oilfield Indus./Roger's Oil Tool | $145,313.72 |
| OSCA | $ 1,337.00 |
| Peterson Maritime Service | $ 3,087.00 |
| Rebel Testers | $ 11,912.69 |
| Reserve Pit Pumping | $ 54,625.00 |
| Southern Oil Field | $ 7,791.00 |
| Swaco | $ 41,164.00 |
| Totco | $ 65,303.28 |

and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

21.43(a). The provisions of this Code are conditions upon which foreign insurance corporations shall be permitted to do business within this state, and any such foreign corporation engaged in issuing contracts or policies within this state shall be held to have assented thereto as a condition precedent to its right to engage in such business within this state.

The subject policies were prepared, executed and paid for in Texas, and the insureds are all residents of, or are incorporated in Texas.

With regard to each of these claims, Hartford asserts that it has no duty to defend since no suit has been filed, and respecting coverage, Hartford argues that none of the bankruptcy debts now being claimed by Tomlinson fit the damages provisions of the "ultimate net loss" definition in the policy since they do not represent "sums which the insured and his or her insurers shall become legally obligated to pay as damages, whether by final adjudication or settlement with the company's written consent...." These claims, according to Hartford, are merely general debts of Tomlinson for which the umbrella policy does not provide coverage. Moreover, the "no action" clause of the policy requires, as a condition precedent to an action against Hartford for recovery under the policy, that "the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

The court is of the opinion that, in view of the provisions of the policy, Hartford is under no present obligation as to the claims pending against Tomlinson in the bankruptcy court for equipment damaged or destroyed as a result of the blowout, though the court cannot conclude at this time that no such obligation will arise. Accordingly, neither Tomlinson nor Hartford is entitled to judgment at this time relative to those particular equipment claims.

█ Hartford next contends that certain of the equipment damage claims are not payable under its umbrella policy for the reason that Tomlinson paid the claims without Hartford's consent in violation of the

no action and consent to settlement clauses in the policy:

| | |
|---|---|
| A Plus Steel Fabricators, Inc. | $ 3,350.08 [15] |
| Murco Drilling | $30,000.00 |
| Halliburton | $36,235.82 [16] |
| Petroleum Equip. Tools (Petco) | $41,000.00 [17] |

Tomlinson also seeks, in connection with these claims, the sum of $9,861.09 which was paid to the law firm of Daniel, Coker, Horton & Bell to defend these claims. Hartford contends that Tomlinson is not entitled to reimbursement of these equipment claims because Tomlinson paid the claims voluntarily and without Hartford's consent. Hartford's primary policy provides as follows:

4(c) The **insured** shall not, except at its own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of the accident.

5. **Action Against Company.** No action shall lie against the company unless, as a condition precedent thereto, there shall have been a full compliance with all of the terms of the policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured,** the claimant, and the company.

Paragraph 5 also appears in Tomlinson's umbrella policy. In response to Hartford's assertion that these claims are not covered by virtue of Tomlinson's payment of the claims without the claims having first been reduced to judgment and/or without notice to and approval by Hartford, Tomlinson argues that Hartford is precluded from relying on the no action and consent to settlement clauses to avoid liability by vir-

15. The A Plus Steel Fabricators claim was paid by Tomlinson as the result of a judgment entered against Tomlinson in the Circuit Court of Marion County, Mississippi. After the judgment was entered, and apparently because Hartford could not determine from the judgment the basis for the decision, a motion was filed requesting edification of the basis of liability in order that a determination of coverage could be made. Before a ruling on that motion, though, Tomlinson paid the judgment. Hartford thus characterizes the payment of this claim as a settlement.

16. The Halliburton claim was settled for $100,-000; $36,235.82 represents the amount claimed by Tomlinson to be that portion of the settlement attributable to Hartford's policy.

17. It appears that the Petco claim was settled by Tomlinson for a greater amount but from what the court is able to discern, all that is sought under Hartford's policy is the sum of $41,000.

tue of Hartford's having consistently denied coverage of the claims.

It is undisputed that Hartford took the position at least from December 1986 that no coverage was provided under policy 1262 for Tomlinson's Johns Field operations and that Hartford, on that basis, denied coverage for all claims by Tomlinson in connection with the blowout. It was not until after suit was filed against Hartford seeking recovery under Tomlinson's umbrella policy that it was judicially determined that the policy does provide coverage for the Johns Field. It is generally recognized that once an insurer denies coverage and liability, the insured has the right to settle with its claimant rather than proceed to trial. *See Franklin v. Oklahoma City Abstract & Title Co.*, 584 F.2d 964 (10th Cir.1978) (policy provisions prohibiting out-of-court settlements between insured and claimant not enforced when insurer repudiates coverage or denies liability); *Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F.Supp. 710 (W.D.Okla.1981) (insured may settle claim without consent of insurer if insurer denies liability); *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 530 F.Supp. 1110 (D.C.1982) *aff'd in part, rev'd in part,* 743 F.2d 932 (D.C.Cir.1984) (policy provisions prohibiting out-of-court settlements between insured and claimant without consent of insurer not enforced when insurer repudiates coverage or denies liability). Texas law, which the court has held to be applicable, is in accord.

The Texas Supreme Court, in *Gulf Insurance Company v. Parker Products, Inc.*, 498 S.W.2d 676, 679 (Tex.1973), held that where an insurer refuses to tender a defense to its insured and denies coverage on a claim made against its insured, and the insured thereafter negotiates a settlement of the claim, the insurer is entitled to raise a policy defense of exclusion of coverage set forth in the policy, but the insurer is not entitled to require compliance by its insured with conditions precedent found in the policy. Similarly, in *Womack v. Allstate Insurance Company*, 156 Tex. 467, 296 S.W.2d 233, 236–37 (1956), the court held that an insurer's written repudiation of its policy which was delivered to its insured two days before the suit was filed against the insured operated as a waiver of the insurer's right to insist upon compliance with a policy condition requiring delivery of process and pleadings to the insured. *See also Simon v. Maryland Casualty Co.*, 353 F.2d 608 (5th Cir.1965) (no action clause in liability policy eliminates out-of-court settlements between assured and damage claimant without consent of insurer but assured entitled to exercise judgment of prudent uninsured person in compromising claim when insurer repudiates coverage).

In *Ford v. State Farm Mutual Automobile Insurance Company*, 550 S.W.2d 663 (Tex.1977), the court was presented with the question of whether an insurer waives the consent provision of its policy by a prior unconditional denial of liability. In *Ford,* it was stipulated that State Farm had denied liability to its insureds, and it was further stipulated that prior to their settlement with a third party, the insureds made no request or demand upon State Farm to approve the settlement. The court in *Ford* quoted at length from a prior Fifth Circuit decision, *Stephens v. State Farm Mutual Automobile Insurance Company*, 508 F.2d 1363 (5th Cir.1975), in which the court had predicted that the Texas courts, if confronted with the issue, would conclude that "a denial of coverage waives the consent clause." In so predicting, the Fifth Circuit made the following observation, which was quoted and approved in *Ford:*

> The rationale behind holding to this particular waiver theory is that a claimant should not be required to approach his insurer, hat in hand, and request consent to settle with another when he has already been told in essence, that the insurer is not concerned, and he is to go his way. It is difficult to see why an insurer should be allowed, on the one hand, to deny liability and thus, in the eyes of the insured breach his contract and, at the same time, on the other hand, be allowed to insist that the insured honor all his contractual commitments.... [I]n the

case of existent, denied liability the denial is a breach of contract on the part of the insurer and its breach should by rights relieve the insured of the punitive effects of his failure to comply with consent provisions of the insurance policy. *Stephens*, 508 F.2d at 1366 (*quoted in Ford*, 550 S.W.2d at 666). The *Ford* court noted that the waiver theory is in accord with principles of Texas contract law and adopted the rule espoused in *Stephens* as Texas law, stating

> State Farm neither paid nor pursued any of its affirmative steps for determination of what, if anything, it was due to pay plaintiff. Instead, it unconditionally denied all liability under the policy. This intentional conduct was inconsistent with claiming the right under the policy to consent before its insured settled with a third party. Such conduct constituted a waiver of that right.

*Ford*, 550 S.W.2d at 666. Finally, the court observed that by virtue of its unconditional and, as it turned out, incorrect denial of coverage, State Farm "lost only the inconsistent right to assert the exclusionary consent clause as a grounds for forfeiture of plaintiff's entire coverage." *Id.*[18]

In the case *sub judice*, Hartford took the unequivocal position that the Tomlinson umbrella policy did not provide coverage for the equipment damage claims presented by Tomlinson for the reason that the policy provided no coverage for Tomlinson's Johns Field operations. Hartford thus denied liability for the claims. And while the question of coverage under the policy was ultimately presented to a court for consideration and determination in *Jones v. Hartford Accident and Indemnity Co.*, 714 F.Supp. 808 (S.D.Miss.1989), that occurred not because Hartford "pursued any of its affirmative steps for determination of what ... it was due to pay,"

*Ford*, 550 S.W.2d at 666, but rather because suit was filed against Hartford by parties claiming that, contrary to the position taken by Hartford, coverage was available under the policy.[19]

Since the only basis asserted by Hartford for its contention that the policy provides no coverage for this category of equipment damage claims is Tomlinson's failure to comply with the no-consent clause, and since Hartford is deemed to have waived that defense to coverage by its wrongful denial of coverage, these claims are payable under the policy.

■ With reference to yet another category of claims, Hartford urges that coverage is unavailable under policy 1262 for the reason that the claims for damage to the equipment, each of which is currently being defended by Hartford, are based not upon Tomlinson's negligence, but rather upon Tomlinson's alleged breach of contract in failing to return the equipment to its owner. These include the following claims:

> La–Tex Rentals, Inc. filed suit against Tomlinson in the Civil District Court for the Parish of Orleans, Louisiana, Civil Action No. 86–6879, requesting judgment for $6,829.63 on the basis of Tomlinson's non-return of leased equipment. The suit alleges that the reason for the non-return of the equipment was Tomlinson's negligence.
>
> Four JM's, Inc. filed suit against Tomlinson in the Civil District Court for the Parish of Orleans Louisiana, Civil Action NO. 86–6880, requesting judgment for $15,130 on the basis of Tomlinson's failure to return equipment destroyed as a result of the blowout. The petition for damages alleges that the blowout was a direct result of Tomlinson's negligence. Oilfield Rental Services instituted an adversary proceeding against Tomlinson in

**18.** That, presumably, is because under Texas law, an insurer's denial of coverage operates only to deprive the insurer of the right to insist on compliance with policy conditions; it does not estop the insurer to assert the defense of noncoverage under the coverage provisions or exclusions under the policy. *Texas United Ins. Co. v. Burt Ford Enter., Inc.,* 703 S.W.2d 828 (Tex.App.1986).

**19.** The court would note additionally that while Hartford did defend Tomlinson against certain of the equipment damage claims, it did so pursuant to an injunction of the Texas bankruptcy court which prohibited Hartford from abandoning its defense of Tomlinson.

the Houston bankruptcy court, Adversary No. 87-0247, asserting a claim for recovery of $769,189.68. Though the complaint sets forth causes of action based on breach of contract (rental agreements) and quantum meruit, it also contains a count for negligence, wherein it is asserted that the plaintiff's equipment was destroyed as a result of the negligence of Tomlinson.

Texas Snubbing and Albany Insurance Company brought suit against Tomlinson in the Circuit Court of Rankin County, Cause No. 15,344, seeking damages of over $460,000 for Tomlinson's failure to return Texas Snubbing's equipment which was destroyed at the blowout site. The complaint contains allegations of Tomlinson's negligence.

Hartford contends that the umbrella policy provides no coverage for these claims inasmuch as they are predicated on breaches of contracts; its policy, according to Hartford, is a liability policy covering only tort liability arising out of an "occurrence" resulting in an ultimate net loss through bodily injury or property damage. Hartford asserts that a simple breach of contract claim based upon an open account or failure to return rented equipment does not amount to a covered claim under Tomlinson's policy. Hartford urges additionally that coverage for such contract claims is specifically excluded under the terms of the policy. The court cannot accept Hartford's position in this regard.

It is clear to the court that in the absence of an applicable exclusion, the claims for damaged equipment are covered under the policy. Contrary to Hartford's assertion, the policy admits of no limitation of coverage to tort claims only. Rather, the policy provides coverage for sums which the insured becomes legally obligated to pay because of property damage due to an occurrence; the damage to equipment falls within the policy definition of "property damage" and the damage resulted from an "occurrence," the blowout. The exclusion upon which Hartford relies to remove these claims from coverage does not appear in the umbrella policy [20] but rather is found in the primary policy, and reads as follows:

1. Exclusion. This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental agreement.... [21]

The policy definition of "incidental agreement" does not encompass the rental agreements that are claimed by Hartford to provide the bases for the claims of these equipment owners against Tomlinson.[22] The question, therefore, would seem to be whether Tomlinson assumed liability under the rental agreements, within the meaning contemplated by the policy. In this regard, in *Olympic, Inc. v. Providence Washington Ins. Co.*, 648 P.2d 1008, 1011 (Alaska 1982), the sole case relied on by Hartford in support of its argument regarding the applicability of the contractual liability exclusion, the court observed that:

A general liability policy insures only against "liability which the law imposes upon all insureds alike." 1 R. Long, [Law of Liability Insurance] @ 1.11, at 1–26. The contractual liability exclusion functions to relieve the insurer of responsibility for any "extra" liability that the insured undertakes by contract beyond

---

**20.** The umbrella policy does contain an exclusion relating to contracts, which states that the insurance coverage does not apply to "liability assumed by the insured under any contract or agreement with respect to an occurrence taking place before the contract is made." That exclusion is clearly inapplicable to the claims under consideration.

**21.** As far as the court can discern, the umbrella policy does not, by its terms, incorporate the exclusions contained in the primary policy. But even assuming, as Hartford suggests, that the primary policy exclusions, including the contract exclusion, apply to the umbrella coverage,

the court is nevertheless of the opinion that this exclusion does not operate to avoid coverage for the equipment claims under consideration.

**22.** The policy defines "incidental contract" as "any written (1) lease of premises, (2) easement agreement except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement."

the liability imposed by law for negligence.

648 P.2d at 1010 n. 6. The damage to the equipment in the case at bar was not caused by a breach of contract but rather was caused by the blowout which, in turn, it is alleged, was caused by Tomlinson's negligence. Tomlinson did not contract to assume any "extra" liability, or liability to which it would not have been subject under general principles of tort law or perhaps more to the point, Tomlinson does not seek recovery under the Hartford umbrella policy for any liability in addition to that to which it may have been subject in the absence of the rental agreements. Moreover, the court in *Olympic* expressed the view that the exclusion of coverage for "liability assumed under any contract" refers to "liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract;" *id.* (citations omitted); thus, the court held, "the contractual liability exclusion applies only to hold harmless agreements." *Id.* Hartford recognizes in its brief that the basis for liability in the above-described actions is not Tomlinson's having assumed the negligence of someone else. Accordingly, under the *Olympic* decision upon which Hartford relies, the exclusion would be inapplicable.[23]

Hartford states in its brief in opposition to Tomlinson's motion for partial summary judgment that "a simple breach of contract claim based upon an open account or failure to return rented equipment does not amount to a covered claim under the policy." Hartford's characterization of these claims is somewhat simplistic; while each of these claims may be based, in part, on open account or failure to return equipment, ultimately, the reason for the claims is the destruction of the equipment, i.e., "property damage," as a consequence of the blowout, an "occurrence." The claims are not to be considered as falling outside the scope of coverage, nor are the claims excluded from coverage simply because the equipment at issue was at the well site pursuant to rental agreements entered by Tomlinson and the equipment owners. The claims are thus insured under the umbrella policy.

Post–Blowout Evacuation Expenses

 Following the blowout of the Ross # 2 Well, Tomlinson incurred and paid expenses in connection with the evacuation of persons living in the vicinity of the well. By its motion for summary judgment, Hartford seeks a determination that none of the policies issued to Tomlinson or Republic cover these expenses, arguing first that they do not represent "damages" under the Hartford policies, and secondly, that even if the expenses do qualify as legal "damages," Hartford can still have no liability because Tomlinson paid these expenses voluntarily, in contravention of policy conditions.

As previously stated, the policy at issue, 1262, provides coverage for "ultimate net loss in excess of the applicable limit," and defines "ultimate net loss" as "all sums which the insured ... shall become legally obligated to pay as damage whether by final adjudication or settlement with the company's written consent." Hartford argues that the expenses incurred by Tomlinson were not "damages" as contemplated by the policy and that in any event, Tomlinson was under no legal compulsion to pay these expenses. Tomlinson, on the other hand, takes the position that payment of these expenses was its mandatory legal obligation under an emergency contingency plan which it was required by law to develop and implement and that, therefore, these expenses are "damages" for which Tomlinson was under a legal obligation to pay.

---

**23.** At issue in *Olympic* was the failure of a tenant to procure a liability insurance policy which named the lessor as an insured, as was required by its lease contract. After a loss occurred on the premises—a firefighter's death—and the lessor's insurer settled the ensuing litigation on behalf of the lessor, it sought indemnification from the tenant's carrier in the amount of one-half of the settlement. The carrier claimed that it was damaged as a result of the tenant's breach of its agreement to procure the described insurance because it was required to pay that amount to the firefighter's estate for his bodily injury.

It is undisputed that pursuant to an order of the Mississippi State Oil and Gas Board dated March 18, 1982, Tomlinson, as operator of the Ross #2 Well, was required to develop and file with the Board an Emergency Contingency Plan which had to include an emergency evacuation plan. The facts surrounding Tomlinson's payment of these evacuation expenses are the subject of some dispute. Darrell Bell, Tomlinson's accounts payable manager and insurance manager, asserts in his affidavit that pursuant to the contingency plan, Tomlinson immediately began to evacuate persons in the vicinity of the well following the July 15, 1985 blowout. Initially, persons in a one-mile radius of the well were evacuated. The evacuation extended to a three-mile radius over the few days following the blowout, and ultimately, the evacuation was continued pursuant to order of the Mississippi Emergency Management Agency. Bell states in his affidavit that notwithstanding Tomlinson's requests for claims adjustment, Hartford did not make a claims agent available for at least six days after the blowout. In the meantime, many of the evacuees were without cash or credit cards to obtain food and lodging, and Tomlinson therefore directly paid for the evacuees' hotel rooms and food and paid also for security of the evacuated area during the period immediately following the blowout. Tom Graves, general counsel and insurance manager of Tomlinson, similarly states that receiving assistance from Hartford following the blowout proved difficult. Graves states that despite Tomlinson's repeated efforts to obtain assistance from Hartford, Hartford representatives did not finally become involved in the adjustment process until July 21, six days after the blowout. However, before Hartford representatives arrived to offer assistance, it became apparent to Graves and Bell that the evacuation would continue for some period of time and they therefore began making more permanent arrangements for the evacuees, and advanced funds to cover lodging and subsistence expenses of evacuees.

According to Graves, once the adjusting process began, he continually apprised Jim Napper, Hartford's claims representative, of what Tomlinson was doing with the evacuees and its efforts for cost containment. Tomlinson claims that Hartford, through Napper, agreed prior to September 1985 to pay evacuation expenses in the one-mile area surrounding the well. After the evacuation process was completed, Tomlinson in late 1985 or early 1986 submitted to Hartford for payment a claim package totaling $645,587.33 for evacuation expenses paid by Tomlinson; Tomlinson thereafter submitted a supplemental package of $180,-000.00. Graves states that despite Hartford's having led Tomlinson to believe that the claims would be paid, and despite repeated requests by Tomlinson for information concerning the claims, Hartford did not advise Tomlinson of its position on coverage until December 1986, and Hartford then, for the first time, informed Tomlinson that the claims would not be reimbursed.

Hartford's version of events differs somewhat from that described by Tomlinson. According to Hartford, Jack Combes, a Hartford claims representative, set up an emergency office four, rather than six, days after the well blowout. By the time Combes arrived, Tomlinson already had several representatives on the scene, including Graves, and had already contracted with various restaurants and hotels in Jackson to provide emergency lodging and meals to evacuees, and had also already contracted for payment of expenses such as public relations fees, adjuster's fees, attorney's fees, and other miscellaneous expenses. Hartford acknowledges that Combes was advised by Graves that these steps had been taken in compliance with a pre-arranged emergency evacuation plan formulated before the blowout. Hartford denies, however, that Tomlinson ever suggested to Combes that Hartford was expected to reimburse Tomlinson for these expenses, and states that Combes never made any representation or promise, express or implied, that Hartford would reimburse Tomlinson for these expenses. In addition, Napper stated in an affidavit that he was aware that Tomlinson was "under a legal obligation to do all that they could do

to mitigate the damage[s]" caused by the blowout, but that he "never made any statements to anyone at Tomlinson ... which would encourage Tomlinson to rely upon [his] word for reimbursement of expenses from The Hartford for expenses not covered by their policy."

Tomlinson argues that Hartford is liable under the umbrella policy for these expenses because Tomlinson was legally obligated to pay evacuation expenses under the Mississippi Emergency Management Agency Plan in effect for the Johns Field. Hartford contends, though, that an obligation to pay expenses for complying with the plan is not the same thing as a legal obligation to pay "damages." Neither the primary policy nor the umbrella policy defines the phrase "legal obligation" or the term "damage."[24] Hartford states that the kind of "legal obligation" contemplated by the policy means legal obligation related to litigation or damage claims by a third party. In the court's opinion, Hartford views the scope of this language in the policy too narrowly, particularly in light of the rule in Texas mandating strict construction of insurance policies in favor of insureds. *See United American Ins. Co. v. Selby,* 161 Tex. 162, 338 S.W.2d 160 (1960). Tomlinson was required by the governing authority, the State Oil and Gas Board, to evacuate persons from the vicinity of the well following the blowout if the circumstances presented danger to the surrounding areas, and the expense of doing so was, at least in the first instance, Tomlinson's responsibility. Though the parties have cited no authority addressing this precise issue, and the court has found none, there are numerous cases in an analogous area that are instructive.

In *New Castle County v. Hartford Accident & Indemnity Co.,* 673 F.Supp. 1359 (D.Del.1987), the county brought a declaratory judgment action against its liability insurers, seeking a declaration that the insurers were obligated to defend and indemnify the county for claims in connection with pollution allegedly emanating from landfills utilized by the county, and for remedial measures required by the State Department of Natural Resources and Environmental Control in connection with the alleged pollution. The insurance policy at issue provided, as does Hartford policy 1262, that the insurer "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or property damage." The insurers argued, as does Hartford, that the term "damages," as contemplated by the policy, did not include the county's claim for reimbursement of cleanup costs since they were not amounts which the insured was legally obligated to pay. The court, however, rejected this argument, finding that the claims were covered costs that the County might become 'legally obligated to pay' as a result of actions filed by property owners for injuries they sustained. 673 F.Supp. at 1365–66.[25] Similarly, in *Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394 (D.N.J.1987), the court held that the costs of cleanup and closure of a landfill pursuant to the New Jersey Sanitary Landfill Closure and Contingency Act were recoverable "damages" under comprehensive general liability policies, where the State Department of Environmental Protection's cleanup order required the insured to perform repairs to both its own and third-parties' property and to take specified preventative measures. A Texas

---

**24.** The umbrella policy does describe what the term "damages" does not include: It does not include fines or penalties or damages for which insurance is prohibited by the law applicable to the construction of this policy.

**25.** Hartford appears to take the position that the evacuation expenses were simply first-party claims by Tomlinson simply to recover debts which Tomlinson contracted to pay, rather than claims for property damage which Tomlinson was "legally obligated" to pay. In *New Castle,*

the court rejected a similar argument by the insurers that the claims for cleanup costs by the county were not covered since the claims were only for the county's economic loss, and not for "property damage" suffered by the county, stating "the underlying claim need only require the insured 'to pay damages *because of* bodily injury or property damage.'" *Id.* at 1366. Here, too, Tomlinson incurred the evacuation expenses pursuant to a legal obligation and because of bodily injury and property damage.

district court has expressed approval of the *New Castle* and *Gloucester* decisions:

> Even in cases involving cleanup costs incurred by a policyholder in complying with governmental directives in environmental matters, the weight of authority and better reasoned decisions hold that those costs are "damages."

*Dayton Indep. School Dist. v. Nat'l Gypsum Co.*, 682 F.Supp. 1403, 1411 n. 24 (E.D.Tex.1988) (citing *Gloucester* and *New Castle*), *rev'd on other grounds*, *W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865 (5th Cir.1990); *see also Independent Petrochemical Corp. v. Aetna*, 654 F.Supp. 1334, 1348 (D.D.C.1986) (sums denominated as cleanup costs constituted damages for purposes of liability insurance coverage); *Lansco, Inc. v. Department of Environmental Protection of State of New Jersey*, 138 N.J.Super. 275, 350 A.2d 520 (1975) (holding that coverage under comprehensive general liability policy extended to statutory liability for damages recoverable by State for injury to environment caused by oil spill). Though each of the cited cases concerned cleanup costs which an insured was obliged to expend rather than costs which an insured was obliged to incur in connection with an evacuation, the analysis and conclusions reached in those cases are equally applicable in both situations. The court concludes, therefore, that the costs of the evacuation are "damages" which Tomlinson was "legally obligated to pay," within the meaning of the policy.

Hartford claims that even though the expenses may have been incurred under a mandatory evacuation procedure, i.e., a "legal obligation," and fall within the "damages" provision of the policy, Hartford is still not liable because of Tomlinson's failure to comply with conditions precedent to coverage under the policy, and in particular, paragraph 4(c) of the policy which prohibits voluntary payments by the insured, and the no action and consent to settlement clause contained in the primary policy.[26] As already indicated, the court considers that it is not reasonable to suggest that Tomlinson's payment of the evacuation expenses was "voluntary," for Tomlinson was required by law to effect the evacuation. In response to the argument that Tomlinson has forfeited coverage by its violation of the no action clause, Tomlinson asserts that Hartford is estopped by its actions in connection with the evacuation adjustment process to rely on Tomlinson's noncompliance with the no action clause as a basis for its denial of coverage. Specifically, Tomlinson argues that in the face of an emergency situation, Hartford was immediately notified of the need for prompt action, but delayed responding to Tomlinson's requests for assistance. Furthermore, Hartford was made aware of the steps being taken by Tomlinson vis-a-vis payment for evacuees' expenses, yet never advised Tomlinson that it would not be reimbursed for these payments. In fact, Hartford, according to Tomlinson, led Tomlinson to believe that reimbursement would be made, but then, a year and a half later, refused coverage.

In support of its estoppel argument, Tomlinson relies principally on *Chemical Applications Co. v. Home Indemnity Co.*, 425 F.Supp. 777 (D.Mass.1977). In that case, the insured brought suit against its liability insurer to recover costs expended in cleaning up an oil spill for which it was responsible. The insured could have allowed the government to do the work and then brought suit to recover the costs but it was more cost efficient for the insured to perform the work itself. When the spill occurred, the insured notified the insurer of the emergency, and asked the insurer to advance funds for the insured to commence the cleanup operations. The insurer did not respond, and the insured, under heavy government and public pressure, began the cleanup process using its own funds. Still, there was no response from the insurer. Not until a month after the accident did the insurer make its position known: It denied liability for the work performed by the insured in reliance on a no action clause identical to that at issue here. The court found that the insured incurred the costs of

---

26. *See supra* p. 894.

the cleanup because of the need to respond to an emergency with which it was confronted and with reference to which it could not be obliged to play "fast and loose." The court concluded that under the circumstances presented, the insurer could not avoid liability because of its own failure to assent to the insured's reasonable proposal for attending to the situation:

> Applying the principle of the necessity of good faith and reasonableness, I find that in this case defendant may not deny liability. From the beginning, plaintiff was in a dilemma.... For plaintiff to do nothing, and surrender all control to defendant, who, in turn, would do nothing, would inevitably subject plaintiff to unrecoverable charges. The insurer, under the circumstances, was bound to agree to reasonable action. Plaintiff's proposal to perform cleanup work itself at cost could not do other than benefit the insurer, since the total cost of the cleanup was thereby minimized....

*Chemical Applications,* 425 F.Supp. at 779.

█ In the court's opinion, the rationale and holding of the court in *Chemical Applications* is eminently correct under the facts there presented, and would apply in the present case, assuming the facts are as contended by Tomlinson. That is, if by virtue of Hartford's allegedly unreasonable actions in delaying responding to Tomlinson's emergency, Tomlinson was placed in the untenable position of choosing either to not pay the evacuation expenses and risk greater potential exposure [27] or, on the other hand, pay the costs and risk Hartford's later denial of coverage for Tomlinson's having paid the claims without a judgment or Hartford's express written consent, then it would follow that Hartford should not be permitted to avoid liability. In the same vein, if Hartford by its actions reasonably led Tomlinson to believe that reimbursement would be forthcoming, as for example by knowingly permitting Tomlinson to make the evacuation expenditures with knowledge that Tomlinson expected reimbursement, without advising or suggesting to Tomlinson that coverage would be denied, then it would seem that Hartford should be estopped from reliance on the no action clause to avoid liability under the policy.[28] Under Texas law,

> [t]he doctrine of waiver, as asserted against insurance companies to avoid the strict enforcement of conditions contained in their policies, is only another name for the doctrine of estoppel. It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions.

*Southland Life Ins. Co. v. Lawson,* 137 Tex. 399, 153 S.W.2d 953 (1941) (quoting *Globe Mutual Ins. Co. of New York v. Wolff,* 95 U.S. 326, 24 L.Ed. 387 (1877)). The court concludes that the parties' motions, as they pertain to the post-blowout evacuation expenses, should be denied. In the court's opinion, questions of fact remain regarding the circumstances surrounding the evacuation and adjustment process as they pertain to Tomlinson's claim of estoppel which are best reserved for trial.

Hartford next argues that "most" of the expenses claimed by Tomlinson are "first party" expenses, prime examples of which are public relations costs and attorney's

---

**27.** The parties do not dispute that Tomlinson was required to do all that it could to mitigate its damages. Moreover, Napper acknowledged in an internal memorandum that "Hartford did benefit considerably by Tomlinson's incurring this expense."

**28.** It could certainly reasonable be argued that Hartford knew, or at least should have known at the time it issued the policies, that in the event of a blowout of the well, some action would be required to be taken to protect the surrounding residents and property, even if it did not know of the specifics of Tomlinson's evacuation plan. That is, the nature of the operation insured should have placed Hartford on notice that in the event of such catastrophe, Tomlinson would be required to take affirmative steps to contain the damage. *See Lansco,* 350 A.2d at 525 (insurer should have been alerted to potential legal liability of insured under state anti-pollution statutes which affected and regulated insured's business operations).

fees, which are simply not covered under the terms of the policy because they are not "damages." Hartford's suggestion that "most" of the expenses paid by Tomlinson would not be recoverable as they are not the types of expenses that would qualify as "damages" under the policy appears to be an exaggeration. Assuming that Tomlinson would otherwise be entitled to reimbursement of evacuation expenses that fall within the definition of "damages," the court would nevertheless have some question as to the recoverability of some of the items for which recovery is sought, and finds that presentation via trial of evidence relating specifically to the amounts and nature of expenses incurred would be necessary under the circumstances.

■■■■■ Before leaving the issue of post-blowout evacuation expenses, mention should be made of Hartford's assertion that it "cannot possibly be estopped to deny liability for these expenses" by virtue of a non-waiver and reservation of rights agreement executed between Hartford and Tomlinson on July 19, 1985, four days after the blowout, which provided that Hartford's taking actions to investigate the accident, to advance sums to third parties on Tomlinson's behalf, and defend any suit or suits "shall not in any way waive, invalidate, modify or forfeit any of the terms, conditions and requirements of the policy issued by Hartford...." The only policy referred to in the agreement was the Tomlinson primary policy; the agreement does not purport to relate to the umbrella policy. Under Texas law, "[n]on-waiver agreements are strictly construed against the insurer and liberally in favor of the insured." *Highway Ins. Underwriters v. Griffith*, 290 S.W.2d 950 (Tex.Civ.App. 1956). The agreement that no action by the insurer would constitute a waiver will not be construed to bar the insured from setting up the actions of the insurer as a basis for invoking the doctrine of estoppel. *Orkin Exterminating Co. v. Massachusetts Bonding and Ins. Co.*, 400 S.W.2d 20, 26 (Tex.Civ.App.1965), *rev'd on other grounds*, 416 S.W.2d 396 (Tex.1967). Therefore, under Texas law, the non-waiver agreement does not preclude Tomlinson's assertion of the doctrine of estoppel. Had Hartford intended to preserve its rights under the Tomlinson umbrella policy, the agreement could and should have so provided.

### Punitive Damages

In this action, Tomlinson has asserted causes of action for bad faith under Texas common law, the Texas Insurance Code, and the Texas Deceptive Trade Practices Act. Hartford has moved for summary judgment as to Tomlinson's claim for punitive damages.

In *Jones v. Hartford Accident and Indemnity Co.*, 714 F.Supp. 808 (S.D.Miss. 1989), the court, in ruling that Hartford had failed to sustain its burden to prove mistake so as to entitle it to reformation of policy 1262 to exclude the Johns Field, stated, "Basically, the Court sees the issue as a fairly close one as to what the true intent of the parties were." That statement provides the foundation of Hartford's present motion. Hartford reasons that Tomlinson cannot sustain its cause of action for bad faith against Hartford because Hartford clearly had a legitimate and arguable reason for denying Tomlinson's claim since the court ruled that the matter of mutual mistake was a close call. Hartford obviously views Tomlinson's punitive damages claim very restrictively; that is, Hartford appears to consider that Tomlinson's bad faith allegations are premised solely on Tomlinson's claim that Hartford had coverage under 1262 and unreasonably and wrongfully refused to provide coverage under that policy. Tomlinson's punitive damages claim, however, is much broader in terms of the conduct challenged. In particular, Tomlinson complains that Hartford should be required to pay exemplary damages because of the following: (1) In connection with the post-blowout evacuation expenses claim, Hartford essentially forced Tomlinson to expend sums on evacuation expenses by its failure to expeditiously provide claims service and led Tomlinson to believe that coverage would be provided, but then wrongfully asserted, over a year and a half later, that there was no cover-

age for such expenses; (2) Hartford sought and obtained approval from Knostman, acting on Tomlinson's behalf, of the settlement of Master Cause 15,002, knowing at the time that it intended to seek reformation of policy 1262 to exclude the Johns Field and thus deny additional coverage to Tomlinson, but failed to advise Knostman of its intent to take the position post-settlement that the settlement had expended Hartford's policy limits, which led Knostman to approve a settlement that he would not have otherwise; and (3) Hartford unreasonably delayed advising Tomlinson of its position regarding coverage, and in the interim, failed and refused to respond to Tomlinson's repeated requests for payment of claims under the policy.[29]

■■■ The first question which must be addressed toward resolution of this claim is the question of which state's law to apply, Texas or Mississippi. This court has determined that Texas law applies to all coverage issues. Hartford argues that Mississippi law should be applied to Tomlinson's bad faith claim since each instance of alleged bad faith occurred in connection with the adjustment process, which was handled in Mississippi. Tomlinson's punitive damages claim does not involve strict issues of coverage. Punitive damage considerations do, however, typically stem from and implicate coverage questions and the insurer's conduct in the determination of coverage or lack thereof. Hartford's refusal to pay the evacuation expenses and its defense to payment of those expenses is based on its interpretation of the policy and hence, whether there was bad faith in large part turns on whether the policy provided coverage for those expenses. Hartford also argues that Tomlinson's claim that Hartford acted in bad faith when it denied coverage under policy 1262 is governed by Mississippi law since the letter informing Tomlinson that it had exhausted its coverage came from the Jackson, Mississippi office. Again, however, Hartford's denial was based on Hartford's claim that the parties, in negotiating the insurance contract, had not intended to cover the Johns Field; those negotiations occurred in Texas.

Hartford next contends that Mississippi law relative to punitive damages should be applied as it is an important part of the public policy of Mississippi. The *Boardman* court, as previously observed, held that if the law of the center of gravity state "is contrary to the deeply ingrained and strongly felt public policy" of Mississippi, the court will apply and enforce Mississippi substantive law. *Boardman*, 470 So.2d at 1031. Hartford reasons that the Mississippi Supreme Court's adoption of a stringent standard for the availability of punitive awards[30] establishes an important public policy of this state; since arguably under Texas law punitive damages are more readily available, that law must be considered repugnant to the public policy of Mississippi. The court is not persuaded by this argument, but regardless of whether the Mississippi standard for the availability of punitive damages can be legitimately characterized as "deeply ingrained and strongly felt public policy" which the state, and hence this court, has an interest

---

**29.** In Tomlinson's, Republic's and Knostman's first amended complaint filed December 16, 1988, there is alleged against Hartford a cause of action for "bad faith handling of claim," as follows:

Hartford has handled the Insured's claim in connection with the blow-out in bad faith, and Hartford has acted with malice, with gross negligence, and with reckless disregard for the Insured's right under Hartford's policies. There is no reasonable basis for Hartford's failure to acknowledge coverage for the Insured's losses and liability to third parties under the Hartford policies and for the Insured's post-blow-out expenses, for Hartford's threatened refusal to defend the Insured's in third party lawsuits brought against them in connection with the blow-out, or for Hartford's lengthy delay in responding to the Insured's claims. Pursuant to the Texas Supreme Court's holdings in *Arnold v. National County Mutual Insurance Co.,* 725 S.W.2d 165 (Tex.1987); *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex.1988), and *Vail v. Texas Farm Bureau Mutual Ins. Co.,* 754 S.W.2d 129 (Tex.1988), the insureds are entitled to damages for these bad faith actions by Hartford.

**30.** The Mississippi court requires that there have been no legitimate or arguable reason for the insurer's refusal to pay and additionally that the insurer's conduct have been malicious.

in applying, that policy has no applicability here. In the court's view, the public policy exception in the conflicts arena is intended to effectuate the forum state's concern for and interest in protecting its residents. *See Mitchell v. Craft*, 211 So.2d at 514 (since court was "especially concerned with the protection of its injured domiciliaries and their families," Mississippi had interest in applying state's comparative negligence statute to Mississippi residents); *see also Perry v. State Farm Mutual Auto. Ins. Co.*, 606 F.Supp. 270, 274 (S.D.Miss.1985) (despite state's interest in application of such law, public policy did not require application of state's uninsured motorist law since parties were not Mississippi residents). None of the parties to this litigation are Mississippi residents. Hence, public policy considerations play no role in the decision of what law will apply. The court is of the opinion that Texas law should apply to the resolution of Tomlinson's entitlement to punitive or penalty damages.

The Texas Supreme Court has held that an insurer has a duty to deal fairly and in good faith with its insured. *Aetna Casualty and Surety Co. v. Joseph*, 769 S.W.2d 603 (Tex.App.1989) (citing *Arnold v. National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987)). "A cause of action for breach of this duty exists when there is no reasonable basis for a denial of a claim or a delay in payment or a failure on the part of the insurer to determine whether there is a reasonable basis for the denial or delay." *Id.* And where this duty is breached by an insurer with conscious indifference to the rights of its insured, punitive or exemplary damages may be awarded. *Id.* If the sole issue here were whether Hartford had a reasonable basis for its claim that the policy did not provide coverage for the Johns Field, the court would likely be inclined to grant Hartford's motion as it pertains to Tomlinson's bad faith claim. A carrier "maintain[s] the right to deny invalid or questionable claims and will not be subject to liability for an erroneous denial of a claim." *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212 (Tex.1988). Even though Hartford's position on this issue

was ultimately rejected by the court, the opinion of Judge Barbour demonstrates that Hartford presented evidence—evidence considered by Judge Barbour to have been substantial—to support its position on the issue of mistake. Hartford's denial of coverage on that basis was not, therefore, unreasonable. However, the bad faith issue, as demonstrated *supra*, is not limited solely to Hartford's decision to deny coverage on the basis of its claim that the parties never intended that the Tomlinson umbrella policy cover the Johns Field. Tomlinson's claim that Hartford breached its duty of good faith by allegedly unreasonably delaying responding to Tomlinson's request for adjusting assistance in connection with the evacuation process, refusing to pay evacuation expenses after leading Tomlinson to believe reimbursement would be forthcoming, failing to advise Tomlinson prior to the settlement of Master Cause 15,002 that it would take the position that the settlement exhausted its coverage and that it would thereafter neither pay nor defend any claims against Tomlinson, and allegedly delaying over a year in even responding to Tomlinson's claims for coverage must also be considered. These allegations which relate to Hartford's conduct in the adjustment process, if accepted by the fact-finder, could result in the imposition of exemplary damages and suffice, therefore, to preclude entry of judgment for Hartford on Tomlinson's bad faith claim.

In addition to its claim for bad faith under Texas common law, Tomlinson has averred a cause of action under the Texas Insurance Code, as well as the Texas Deceptive Trade Practices Act based on the actions above described. The court concludes that these claims, likewise, survive Hartford's motion for summary judgment.

Duty To Defend

By its motion for summary judgment, which was filed in November 1989, Hartford seeks an adjudication that it had no duty to defend under the umbrella policy issued to Tomlinson since unlike the primary policy which makes Hartford's provision of a defense mandatory, the umbrella policy makes defense optional by endorse-

ment which changes the phrase "will defend" to "may defend." In its recent opinion, the Texas district court made the following findings and conclusions regarding Hartford's defense obligations under the umbrella policy:

> The provision in Tomlinson's excess liability policy, 61 HUNV 1262, entitled "Investigation, Defense, Settlement" was changed by endorsement to provide that Hartford "may defend any suit ... against the insured." The court finds that "may" means may, not must. This endorsement gives Hartford the option, but not the duty, to defend Tomlinson. Hartford has been defending liability claims against Tomlinson since 1985 and has advised the court that it will continue to defend those claims. Hartford may not cease to defend any claims against Tomlinson which Hartford has already agreed to defend, without either Tomlinson's consent or further order of this court.
>
> For claims in which Hartford has not already undertaken the defense of Tomlinson, Hartford shall inform Tomlinson whether it will defend those claims within 30 days of Tomlinson's clear and unambiguous request for defense. An equivocal response by Hartford will be considered a refusal to defend, entitling Tomlinson to negotiate the claim and seek coverage by Hartford for the settlement amount.

In its order accompanying the opinion, that court ordered as follows:

> Hartford may not cease to defend any claims against Tomlinson which Hartford has already agreed to defend, without either Tomlinson's consent or further order of this court. For claims in which Hartford has not already undertaken the defense of Tomlinson, Hartford shall inform Tomlinson whether it will defend those claims within 30 days of Tomlinson's clear request for defense.

The parties apparently agree that this decision by the Texas court renders moot the duty to defend issue previously presented by Hartford's motion and it is the case, in the court's opinion, that principles of collateral estoppel bar relitigation before this court of this issue.[31] Accordingly, the court need not address that part of Hartford's motion for summary judgment, or Tomlinson's cross-motion, as they relate to the question of Hartford's defense obligations under the umbrella policy.

Attorney's Fees

*Reformation Litigation*

■ Tomlinson seeks by its motion for partial summary judgment filed June 1990 an adjudication that it is entitled to recover attorney's fees and costs from Hartford which were incurred by Tomlinson in pursuing its claim before this court in *Jones v. Hartford Accident and Indemnity Co.*, 714 F.Supp. 808 (S.D.Miss.1989), that policy 1262 provided coverage for Tomlinson's operations in the Johns Field and in defending Hartford's claim for reformation of the policy to exclude the Johns Field operations. Tomlinson's entitlement to recover attorney's fees for litigating the identical claim before the Texas courts was determined by the Texas district court in its recent order. The court held that under Texas law, which applied to determine the rights and obligations of Tomlinson and Hartford under the policies, including Tomlinson's right to attorney's fees, the bankruptcy court's judgment awarding attorney's fees to Tomlinson should be affirmed.

This court is unable to ascertain from the Texas district court's opinion and order the scope of its ruling on the attorney's fees issue. There is no indication that the Texas court directly addressed any issue other than Tomlinson's entitlement to attorney's fees for the Texas action; the opinion, as this court interprets it, does not purport to grant Tomlinson attorney's fees for litiga-

---

**31.** The prerequisites to application of collateral estoppel, set forth below, are satisfied here: (1) that the issue at stake be identical to the one involved in the prior litigation; (2) that the issue have been actually litigated in the prior litigation; and (3) that the determina-

tion of the issue in the prior litigation have been a critical and necessary part of the judgment in that earlier action.
*Stovall v. Price Waterhouse Co.*, 652 F.2d 537, 540 (5th Cir.1981).

tion before this court. However, this court is of the view that under Texas law, which it considers applicable to the issue,[32] attorney's fees are properly payable to Tomlinson for the reformation litigation before Judge Barbour.

Section 38.001 of the Texas Civil Practice and Remedies Code provides for attorney's fees in suits for a breach of contract.[33] A suit for the breach of an insurance contract is a suit on a contract within the meaning of section 38.001, *Texas Farmers Ins. Co. v. Hernandez,* 649 S.W.2d 121, 124 (Tex. App.1983) (attorney's fees can be recovered in all suits on insurance contracts), and an award of attorney's fees to a party who proves a breach is mandatory, *Shelton v. Exxon Corp.,* 719 F.Supp. 537, 551 (S.D.Tex.1989) (citing *Gerdes v. Mustang Exploration Co.,* 666 S.W.2d 640, 645 (Tex. App.—Corpus Christi 1984, no writ) wherein court discussed mandatory nature of award). Hartford's denial of coverage under the umbrella policy amounted to a breach of contract, *Stephens v. State Farm Mut. Auto Ass'n,* 508 F.2d 1363 (5th Cir.1975) (denial of coverage is breach of contract), and since Tomlinson prevailed in establishing coverage under the policy, it is entitled to attorney's fees for its efforts if the statutory requirements for an award have been satisfied.

Prerequisites to recovery of attorney's fees under the statute are:

(1) the claimant must be represented by an attorney;

(2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party;

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

Tex.Rev.Civ.Stat.Ann. art. § 38.002. It is undisputed that Tomlinson, from the first notification by Hartford of Hartford's position that the Tomlinson umbrella policy did not apply to the Johns Field, demanded that Hartford provide coverage. Hartford denies, however, that it was ever presented with a claim by Tomlinson for payment under the umbrella policy, arguing that all Tomlinson ever requested was that Hartford acknowledge coverage under the policy. Clearly, though, Tomlinson's demand that Hartford acknowledge coverage and its efforts to establish coverage were necessary steps toward recovery under the policy, in view of Hartford's position that the policy in question was simply and altogether inapplicable to Tomlinson's Johns Field operations. The court thus rejects Hartford's contention and concludes that the statutory prerequisites to an award of

32. Though Hartford urges the court to apply Mississippi law on the question of the availability of attorney's fees, the court finds that Texas law governs the issue. The court has already concluded that Texas law applies in determining the various rights and liabilities imposed by the insurance contracts on Hartford and Tomlinson. Hartford argues that even if Texas law applies to the contract issues, Mississippi law should be applied to the attorney's fees question; it reasons that it is the public policy of Mississippi to follow the American rule regarding attorney's fees and since Mississippi conflicts rules prohibit the application of laws violative of Mississippi public policy, the court is precluded from applying Texas law. The court has already determined, in connection with the punitive damages issue, that public policy considerations are not particularly relevant since none of the parties are Mississippi residents. And in any event, the court is not persuaded that a disallowance of attorney's fees is appropriately considered the "public policy" of Mississippi. Indeed, the Mississippi courts do recognize the availability of attorney's fees where provided by statute. *See Central Bank of Mississippi v. Butler,* 517 So.2d 507, 512 (Miss.1987) (attorney's fees may not be awarded in absence of contractual provision or statutory authority). Moreover, in view of the fact that, as is discussed *infra,* it is clearly a substantial policy of the State of Texas to allow the recovery of attorney's fees in certain cases, as reflected by its statute which makes allowance of the fees mandatory in those cases, Texas law should apply to this issue. *See People of Sioux County v. National Surety Co.,* 276 U.S. 238, 48 S.Ct. 239, 72 L.Ed. 547 (1928) (cited in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975)).

33. The statute provides as follows:

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ...

(8) an oral or written contract.

Tex.Rev.Civ.Stat.Ann. art. § 38.001.

908

attorney's fees for the reformation litigation have been satisfied.

Regarding the amount of fees to be awarded, Tomlinson has submitted the affidavits of William H. White of the Susman, Godfrey & McGowen law firm, and of Christopher A. Shapley of Brunini, Grantham, Grower & Hewes, to establish that in connection with Hartford's reformation claim, Tomlinson incurred attorney's fees of $204,566.53, and litigation costs of $24,-548.88. Though it has been determined by the ruling of the Texas court and by the decision of this court that fees should be recoverable for both actions, a specific award by this court at this time is inappropriate. As previously observed by the court, it is difficult to discern whether the Texas court's order encompassed, or was intended to encompass attorney's fees for the Texas and Mississippi reformation litigation, or whether its ruling was limited to fees incurred in the Texas suit; the district judge in the Texas case stated in his opinion that if the attorneys could not agree on the amount of attorney's fees and expenses incurred "since the entry of the bankruptcy court's judgment," the court would determine the amount at a later date, but it was not made clear by the opinion or order whether the later incurred fees to be awarded were to include fees for the Mississippi litigation. The affidavits with which this court is now presented claim recovery for fees incurred in both actions. Thus, assuming that the Texas opinion applies to fees for the Mississippi case, a further award by this court would be improper. If, however, the Texas order applies only to fees for the Texas action, an award by this court of fees for the Mississippi case would be in order, but it is impos-

sible to determine the proper amount of any such award.[34] Accordingly, while the court concludes that Tomlinson is entitled to an award of attorney's fees for the reformation litigation, *Jones v. Hartford*, given the court's present uncertainty regarding the scope of the Texas court's order, an award should not be made at this time.[35]

### Present Motions

In addition to its request for attorney's fees for the reformation litigation, Tomlinson, apparently assuming it would prevail on the issues presented, has asked that this court award it attorney's fees in connection with its motion for partial summary judgment and its cross-motion for summary judgment. While the court has determined that certain of Tomlinson's claims for coverage under the policy are meritorious and it appears that as to those claims an award of attorney's fees would be in order, there remain for trial a number of issues concerning potential coverage. The extent of Tomlinson's entitlement to attorney's fees will depend on the ultimate disposition of these issues, and therefore, in the court's opinion, it would be more efficient to await a determination of this attorney's fees issue until resolution of the remaining issues between Tomlinson and Hartford. In any event, it would be difficult at best, to attempt at this time, when so few issues have been resolved, to separate and attribute fees incurred to claims for which fees are presently awardable, as contrasted with those for which a determination of the availability of fees is yet to be made. The court, accordingly, will reserve ruling on this issue at this time.

34. That is because, as stated, the affidavits include fees for both actions. Additionally, while the affidavits recite that the fees charged are customary and reasonable, that assertion is disputed by an affidavit of Jim Napper which Hartford has submitted, and the affidavits do not contain an accounting of the number of hours spent or the hourly rate charged.

35. The court also has some question concerning Tomlinson's request for litigation costs for the reformation litigation because the judgment entered in J87–0132(B) in August 1989 provided

that "costs incurred by Intervenors shall be taxed to Hartford." Further, the Fifth Circuit ordered in April of 1990 that the costs of appeal of that action were to be borne by Hartford. It is not clear why Tomlinson would request "litigation costs" in this case for costs incurred in another case before the court in which it has already been ordered that costs of court were recoverable. Moreover, there is no indication in the submissions of the nature of the "litigation costs" for which recovery is sought.

## INTERNATIONAL'S MOTION FOR SUMMARY JUDGMENT ON DROP DOWN ISSUE

 International filed a motion for summary judgment requesting a declaration that it is not obligated to "drop down" in place of the policy issued by Mission, which is now insolvent. In response to a motion by Pierce for summary judgment seeking an adjudication that Pierce is insured under the Hartford policies as well as the International policy, plaintiffs requested that the court abstain from ruling on the drop down issue, as well as all issues concerning Pierce's status as an insured, asserting that the issues are not ripe for adjudication. Plaintiffs reason as follows: They filed this declaratory judgment action at a time when Hartford represented that it had exhausted all of its policy limits and had tendered the defense and indemnity of Tomlinson, and other insureds, including Pierce, to the first layer of excess coverage, provided by Mission. Mission was in liquidation at the time and Hartford therefore called upon International to "drop down" to provide coverage within the limits of the policy issued by Mission. Mission and International were thus placed in the driver's seat, so to speak, and sought direction from the court via declaratory judgment as to the proper course to follow. However, Judge Barbour's August 25, 1989 determination that Hartford had an additional $5,000,000 in available coverage relieved Mission and International of any immediate need to respond to the requests for defense and coverage of Pierce, or anyone else, as a result of the blowout. In fact, as a result of the court's decision that Hartford's policy still provides coverage, a determination of the available coverage under the Mission and International policies would become necessary only in the event that Hartford's $5,000,000 is exhausted, and that eventuality may never come to pass.

As the Fifth Circuit recently explained in *Rowan Companies, Inc. v. Griffin*, 876 F.2d 26 (5th Cir.1989), the Declaratory Judgment Act, 28 U.S.C. § 2201, requires that the exercise of judicial power be reserved for "case[s] of actual controversy."

In other words, the court may only act where there is a justiciable controversy.

The purpose of the Declaratory Judgment Act is "to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued. *Government Employees Ins. Co. v. LeBleu*, 272 F.Supp. 421, 427 (E.D.La.1967) (quoting 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Edition) § 1262). The declaratory judgment vehicle also is intended to provide a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of contractual duty.

*Rowan*, 876 F.2d at 28. In determining the propriety of judicial resolution, the question is always "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *id.* at 28 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), since "a hypothetical, conjectural, or conditional question, or one based upon the possibility of a factual situation that may never develop," does not present a justiciable controversy and may not be offered as a basis for present judicial action, *id.* at 28 (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir.1967); *see also Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.*, 843 F.2d 840, 845 (5th Cir.1988) (court should not decide cases that turn on uncertain and contingent future events that may not occur as anticipated, or may not occur at all); *Exxon Corp. v. Busbee*, 644 F.2d 1030 (5th Cir.), *cert. denied*, 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981).

With these principles in mind, the court must agree that International's request for an adjudication that its coverage does not "drop down" into the place of the now insolvent Mission, as evidenced by its complaint and its' motion for summary judgment on that issue, does not present a ripe,

justiciable controversy for purposes of securing declaratory relief from the court. The court recognizes that as a result of the court's ruling in *Jones v. Hartford* that the Tomlinson umbrella policy applies to covered losses caused by the blowout, there is in effect an additional $5,000,000 of coverage. Only if that coverage were to be exhausted would there be a need for a determination of whether the International policy would operate to provide the next layer of coverage, and that may never happen. None of the parties have even suggested to the court the likelihood that such eventuality will or will not occur. There is merely a possibility that the described factual situation will develop and that, as the *Rowan* court explicitly observed, will not suffice as a basis for present court action.

HARTFORD'S MOTION FOR SUMMARY JUDGMENT ON PIERCE'S STATUS AS INSURED UNDER HARTFORD POLICY 1262; PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON STATUS AS INSURED UNDER HARTFORD POLICY 1262 AND INTERNATIONAL POLICY

■ Just as with the drop down issue, International contends that the questions of whether Pierce is an insured under the Hartford policies and International's liability to Pierce under its policy are not ripe for decision as a result of Judge Barbour's ruling in *Jones v. Hartford* that policy 1262 provides coverage for the blowout of the Ross # 2 Well. International filed this action contending that Hartford's coverage for the blowout was not exhausted since Hartford had wrongfully added insureds, including Pierce, following the blowout and had wrongfully expended policy proceeds on behalf of those insureds. International reasons that since there is now additional coverage available under Hartford's policies, no decision need be made at this time concerning whether Hartford wrongfully depleted its underlying coverage by virtue of its having treated Pierce as an insured. The court concludes, however, that this claim, unlike International's claim relative to the drop down issue, does present a real, live and justiciable controversy.

It should be noted initially that when plaintiffs initiated this suit, this issue was clearly justiciable. Because of Hartford's claim that its coverage had been exhausted and International's being called upon to take up the defense and payment of claims, a "real, definite, and concrete" issue was presented as to whether International's coverage was then to be properly invoked. *Rowan*, 876 F.2d at 28. The court's ruling in *Jones v. Hartford* might in other circumstances have operated to render the issue moot, or in the plaintiffs' terminology, "unripe." However, after the litigation had commenced and Pierce had intervened, but before Judge Barbour's ruling, an issue was presented between Pierce and Hartford concerning whether Pierce was an insured under Hartford's coverages. Hartford's amended claim for declaratory judgment alleged that Pierce was not an insured under policy 1262 and requested that the court order Pierce to pay Hartford for the cost of the defense it was funding for Pierce. Hartford conceded that Pierce was insured under the primary policy, but denied that Pierce, or anyone else involved in the Johns Field operation, was insured under the umbrella policies. Although Hartford has now declared that it is "neutral" on this issue, as is discussed *infra*, it is nevertheless the case that an issue was presented and remains for resolution as between Hartford and Pierce as to whether Pierce is an insured under policy 1262 which, in turn, involves consideration and resolution of whether Pierce was an insured under the Tomlinson primary policy. Thus, though perhaps a decision on the question of Pierce's status as an insured under Hartford's policies is not necessary at this time from International's standpoint, it is nevertheless ripe for adjudication.

Dan Pierce was an employee of Pierce Petro–Management, Inc., which did business as Pierce Petroleum. By agreement dated June 4, 1985, Tomlinson contracted with Pierce Petro–Management, Inc. d/b/a Pierce Petroleum to provide project and drilling supervision services in connection with the drilling and testing of the Ross # 2 Well. None of the Hartford policies

issued to Tomlinson or Republic named Pierce as an insured.[36] Hartford and Pierce, however, agree that Pierce was intended to be a named insured under policies 0639 and 1261 and that Hartford erroneously omitted to add Pierce as an additional named insured prior to the loss; therefore, following the loss and Hartford's realization of its error, an endorsement was prepared adding Pierce as an insured. Accordingly, Hartford advised Pierce that because the parties to the insurance contracts had intended that Pierce be insured under the Tomlinson primary and Republic excess policies, Pierce would be treated as an insured under those policies and would thus be entitled to the defense and indemnity obligations provided for by those policies.

By its motion for summary judgment, Hartford seeks an adjudication that Pierce was properly treated as a named insured under the 0639 and 1261 policies and that it has thus acted properly in defending and indemnifying Pierce pursuant to its primary policy based on the intention of the parties to the contract that Pierce be a named insured. Pierce seeks a declaration by the court that he was insured under not only Hartford's primary policy and the Republic umbrella policy, but policy 1262 as well, and that Pierce was also insured under the International policy.

Hartford initially took the position in this litigation that while the parties to the insurance contracts intended to name Pierce as an insured on policies 0639 and 1261, Tomlinson's umbrella policy, 1262, provided no coverage for Tomlinson's operations in the Johns Field and thus provided no coverage for Pierce. Following Judge Barbour's ruling that policy 1262 applies to the blowout, and the Fifth Circuit's affirmance of that ruling, Hartford has taken a rather curious position: It has advised the court that while there is "a strong argument [to] be made that Pierce is not insured under policy 1262" because Hartford did not intend that Pierce (or anyone else) be covered, Pierce, if found to be an insured under the primary policy, may be an insured un-

der 1262 because the umbrella policy includes as insureds persons insured under the underlying insurance. Hartford, though, proclaims that it "is neutral on the issue of coverage of Pierce under policy number 1262," and asks that the court determine the coverage afforded Pierce under policy 1262.

International denies that Pierce was an insured under any of the policies at issue and claims that despite Hartford's and Pierce's contrary assertions, Pierce was not intended to be an insured under the Hartford policies and that consequently, Hartford has improperly paid out sums in favor of Pierce under its policies. International demands in this action that payments made by Hartford on behalf of Pierce be recredited to the pool of underlying coverage. International further contends that since Pierce was not an insured under Hartford's policies prior to the blowout, it is not an insured under International's policy.

Hartford and Pierce assert that the parties to the insurance contract have the right to voluntarily reform the policy where the policy mistakenly fails to name a person intended by the contracting parties to be insured, and they urge that they had the right to reform the policy of their own accord without obtaining a judgment from the court, even though their doing so might have adversely affected the interests of International. International does not dispute that reformation of a policy for mutual mistake may be had where the policy, as written, does not insure the person or persons intended to be insured. 43 *Am.Jur.2d* Insurance § 363, at 434 (1872). It contends, though, that a prerequisite to the availability of reformation, an antecedent intent, i.e., intent formed prior to the loss that the person will be an insured, is lacking in the case at bar.

In *Great Atlantic Insurance Co. v. Liberty Mutual Insurance Co.*, 773 F.2d 976 (8th Cir.1985), the primary insurer and the insured, following what would have been a covered loss, agreed to voluntarily reform the primary policy retroactively to limit coverage to the insured's Canadian opera-

---

**36.** As noted *supra,* the court will refer to the Pierce intervenors collectively as Pierce.

tion alone, which resulted in the excess carrier's being required to provide the coverage that was excluded from the primary policy by that reformation. Great Atlantic, the excess carrier, filed suit against the primary carrier, Liberty Mutual, seeking to recover sums it had paid under its contract. The court there rejected Great Atlantic's argument that Liberty Mutual and its insured "[could not] voluntarily reform the [primary] policy retroactively, that is, to limit or exclude coverage to [Great Atlantic's] detriment[,]" 773 F.2d at 980, and affirmed the decision of the district judge "granting reformation . . ., or more precisely, . . . recogniz[ing] the prior voluntary reformation" based on his finding that there was clear and convincing evidence of mutual mistake. *Id.* at 979. In the case *sub judice*, as in *Great Atlantic*, both the insured and primary insurer are in agreement as to their intention regarding the primary coverage; here, they agree that Pierce was intended to be an insured whereas in Great Atlantic the contracting parties agreed that coverage under the primary policy was more limited than the policy actually reflected. And in this case, as in *Great Atlantic*, the putative reformation was detrimental to the interests of the excess carrier.

In *Great Atlantic*, even though the excess carrier did not ultimately prevail, the court there permitted the excess carrier to challenge the propriety of reformation by presenting evidence regarding what it contended was the true intention of the parties to the primary insurance contract. There was no suggestion that the court would have recognized or approved the voluntary reformation of the primary policy had the court not been satisfied that the primary insurer had sustained its burden to prove the "legal requirements for a court-decreed reformation," *id.* at 979, that is, to prove each of the elements necessary for reformation, including, in particular, proof that the parties intended something other than what the policy actually provided. The court examined the evidence presented at a trial of the case and determined that:

. The record contains clear and convincing evidence establishing there was an agreement between Liberty Mutual and American Hydrotherm about the territorial scope of coverage provided under the [primary] policy, the [primary] policy was intended to contain the terms of that agreement, and there was a material variance between the mutual intention of the parties to the agreement and the [primary] policy. *E.g., American Employers Insurance Co. v. St. Paul Fire & Marine Insurance Co.,* 594 F.2d 973, 977 (4th Cir.1979) (elements necessary for reformation).

*Id.*

This court is aware of no case in which it has been held that parties may voluntarily reform a contract when the prerequisites to judicial reformation, i.e., the elements of a reformation cause of action, are not present. Indeed, in *L.E. Myers Co. v. Harbor Insurance Co.,* 67 Ill.App.3d 496, 24 Ill.Dec. 182, 186, 384 N.E.2d 1340, 1344 (1978), *aff'd,* 77 Ill.2d 4, 31 Ill.Dec. 823, 394 N.E.2d 1200 (1979), which provides one of the few statements on the issue and which was quoted extensively by the *Great Atlantic* court, the court observed that "[t]here is . . . apparent agreement that in a proper case for reformation, the parties [to the instrument] may do voluntarily *what a court of equity would have compelled them to do,* and with the same effect" (emphasis supplied and citations omitted). A court of equity would not compel reformation in the absence of proof of the elements necessary to sustain the claim.

The question thus becomes whether International has presented sufficient evidence in opposition to the contracting parties' proof to create a genuine issue of material fact regarding what International claims was their true intention. In this regard, Hartford and Pierce have presented evidence to demonstrate that Hartford, Tomlinson and Pierce intended for Pierce to have been added as a named insured to the Tomlinson primary and Republic umbrella policies prior to the blowout. That was not accomplished as a result of an omission on the part of Hartford. After the blowout, Pierce advised Hartford that he was to have been named as an insured under Hart-

ford's policies and demanded that Hartford defend and indemnify him for claims relating to the blowout. An investigation by Hartford confirmed that prior to the blowout, it was agreed that Pierce would be provided coverage by Tomlinson. Hartford determined that Dan Pierce, Tom Graves, Tomlinson's insurance manager and the individual responsible for negotiating and procuring insurance policies for Tomlinson, and Robert Hixon of the John L. Wortham Insurance Agency, who worked with Graves to secure the necessary coverages for Tomlinson and Republic, had met and discussed that Pierce would be an additional insured under Tomlinson's policy and Tomlinson an additional insured under Pierce's policy. Hartford, however, failed to formally endorse the policy to include Pierce as an additional insured prior to the loss.

In opposition to the proof presented by Hartford and Pierce, International has submitted for the court's review the service agreement executed between Tomlinson and Pierce for Pierce's services, which provides that Pierce, the contractor, is responsible for maintaining his own insurance coverage and providing Tomlinson satisfactory evidence that said insurance was being maintained, in the following language:

> Contractor shall, during the progress of work, be responsible to Company for maintaining insurance with an insurance company or companies acceptable to Company. Contractor agrees to furnish Company satisfactory evidence that such insurance is being properly carried and will not be cancelled prior to thirty (30) days after written notice to Company. All such insurance shall be maintained in force and effect until any of the following occurs:
> (a) This contract is terminated as provided herein;
> (b) Upon mutual agreement between Contractor and Company to cancel said insurance.
> Such insurance shall be carried by Contractor, or their subcontractors if so arranged by Contractor, with Company also as named insured.

> Contractor shall submit for Company's approval a certificate of insurance specifying types and limits of coverage carried and such coverage to remain in force until after acceptance of the work by Company. The following insurance will be required, with each coverage to include *a waiver of subrogation in favor of Company* and its coventures, employees, agents, representatives and subcontractors:
> (a) Statutory Workers' Compensation for the State in which work is to be performed and Employer's Liability with limits of $500,000 per person and $1,000,000 each accident.
> (b) Comprehensive General Liability, including automobiles owned, nonowned and hired with a combined single limit of $500,000 per occurrence.
> (c) All insurance required to be carried by the Contractor is to be primary as to any other valid and collectible insurance carried by Company.

This document was executed between Tomlinson and Pierce on June 4, 1985, approximately five weeks prior to the blowout. International has submitted in addition the deposition testimony of John Parsons, the underwriter of the Hartford policies which were issued to Republic and Tomlinson, who stated that he was never requested to add Pierce as an additional insured under any of the Hartford policies at issue. International argues that the effect of the terms of the service agreement respecting insurance coverage could be viewed as an indication that it was not the intent of Tomlinson that Tomlinson would provide insurance coverage to Pierce, and therefore creates a genuine issue of material fact which would preclude the entry of summary judgment. In the court's opinion, however, the fact that the service agreement provided that Pierce would himself maintain insurance is insufficient to create an issue for trial in light of the unequivocal assertions by Tomlinson, Hartford and Pierce that the parties, prior to the loss, intended that Pierce was to have been an additional named insured. The service agreement does not exclude Pierce from being insured under the Tomlinson policies

and indeed, it is implicit in the service agreement provision relative to insurance that there would be other insurance carried by "Company," Tomlinson, which would provide coverage for "Contractor," Pierce. Moreover, the testimony of Parsons that he had not been asked to add Pierce as an insured before the loss hardly suffices to create an issue for trial. One could assume that had Parsons been so requested, the mistake, which all parties to the Tomlinson insurance contract agree occurred, would not have occurred and the issue would not be before the court today. The agent responsible for procuring the coverages affirms that the Hartford agent writing the coverage was aware and intended that Pierce be an insured.

Since Pierce was an insured under the primary policy, it follows that it was likewise an insured under the Tomlinson umbrella policy 1262,[37] which provides, in pertinent part, as follows:

III. Persons Insured

Each of the following, including the named insured, is an insured under this insurance to the extent set forth below:

H. any other person or organization who is an insured under any policy of underlying insurance, subject to all the limitations upon coverage upon such policy other than the limits of the underlying insurer's liability.

Pierce urges that since he was intended to be an insured under Hartford's primary policy, 0639, and its umbrella policy, 1262, he is likewise an insured under the Mission and International policies, each of which by its terms follows the form of the underlying coverage.[38] International argues that the Mission policy, the form of which is followed by the International policy, does not include Pierce as an insured since the Mission policy purports to follow the form of the underlying coverages as they existed "prior to the loss." According to International, Pierce was not an insured under any of the Hartford policies prior to the loss and was only added as an insured following the blowout. International claims that it is incumbent upon Pierce to prove that it was the intent of Tomlinson, Republic and Hartford that he be an insured under 1262 prior to the loss.

The court has already determined that the parties to the underlying policies voluntarily reformed them to include Pierce as an insured, such reformation being made effective *retroactive* to a point in time prior to the loss, as intended by the parties. Pierce, as a consequence, was treated as having been a named insured under the underlying policies at a point in time prior to the loss for indemnity and defense purposes.

Based on the foregoing, the court concludes that Pierce's motion for partial summary judgment against International on the issue of its status as an insured under the Hartford and International policies should be granted. Hartford's motion for summary judgment, insofar as it requests an adjudication that Pierce is an insured

---

**37.** Pierce argues that the issue of Hartford's coverage under policy 1262 was resolved in *Jones v. Hartford,* wherein Judge Barbour, in ruling on a summary judgment motion, stated that policy 1262 insured "Tomlinson … and others [including Dan Pierce]." (brackets in original). Pierce asserts that this ruling by Judge Barbour is *res judicata* on this issue. Pierce fails to mention, however, that this opinion by Judge Barbour was withdrawn. Moreover, at issue in *Jones* was not whether Pierce was insured under the policy, but whether the policy afforded coverage for the Johns Field, generally.

**38.** International's policy states at paragraph two:

Except as may be inconsistent with this Certificate, the coverage provided by this Certificate shall follow the insuring agreements, conditions and exclusions of the underlying insurance [Mission] (whether primary or excess) immediately preceding the layer of coverage provided by this Certificate, including any change by endorsements.

Paragraph Two under the "conditions" heading of Mission policy MN 038651 provides:

This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policy(ies) [Hartford Insurance Company] stated in item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.

under its primary policy should also be granted.[39]

## PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS AGAINST HARTFORD UPON ISSUE OF FAILURE TO HAVE EXHAUSTED POLICY LIMITS, BY VIRTUE OF MULTIPLE OCCURRENCES

▆ Pierce has moved for summary judgment against Hartford requesting an adjudication that Hartford's primary policy limits have not been exhausted because the incident giving rise to the claim for injuries against Pierce, the blowout, was not just one occurrence, as that term is defined in the policy, but rather amounted to multiple occurrences, each occurrence giving rise to a new claim and new liability under the Hartford policy. In support of this contention, Pierce relies on *Anchor Casualty Co. v. McCaleb*, 178 F.2d 322 (5th Cir.1949), in which the court found that

> [t]he blowing out of [the] well was not a single accident but a series of events, a catastrophe. Numerous accidents were the product of this motivating force. The eruptions continued intermittently for over two days; and during this period the wind changed from time to time blowing mud and sand on different properties.... When the separate property of each claimant was damaged, an accident occurred to the property of each owner. If one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident.

*McCaleb*, 178 F.2d at 324–25. Based on this holding, Pierce seeks an adjudication that there were as many occurrences as there were homes which sustained damage from the presence of hydrogen sulfide gas. *McCaleb*, however, does not support such a conclusion in the case at bar. First, in that case the court determined that the language of the policy, "each accident," was required to be construed from the point of view of the person whose property was injured. In contrast, the term "occurrence" is defined in Hartford's policies, as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended *from the standpoint of the insured* (emphasis supplied)." More importantly, the court's decision in *McCaleb* was applied only to determine whether the single occurrence limit of $5000 per accident was applicable or whether the policy's aggregate limit of $25,000 applied. In the case at bar, the single occurrence limit and the aggregate limit are the same so that whether there were multiple occurrences or not, the aggregate limit controls under the policy. In fact, the *McCaleb* court ultimately concluded that the aggregate limit had been inserted in the policy by the insurer to limit its exposure for the kind of catastrophe which resulted from the well blowout: "We think the term 'aggregate' was meant to serve as a total limit of damage to property of different persons from a closely related series of events, such as were evident in this case." *Id.* at 325.

▆ Pierce also argues that the capping of the Ross # 2 Well constituted a separate occurrence from the blowout of the well. However, in the court's view, these are a "closely related series of events," which operate as one occurrence under the policy. *Cf. Liberty Mutual Ins. Co. v. Rawls*, 404 F.2d 880 (5th Cir.1968) (insured under an automobile policy was involved in two, rather than one, accidents within meaning of policy where he regained control before second collision; insured thus not discharged by payment of policy limits to occupants of vehicle in initial collision). Pierce's motion for partial summary judgment on this issue should therefore be denied.

---

**39.** Pierce claims that he was insured not only as an additional named insured but was also an unnamed insured under Hartford's policy by virtue of clauses of the policy which state that the policy will provide indemnification of all contractors of the policy owner. Pierce seeks an adjudication to this effect, irrespective of the court's ruling on the question of his being a named insured under the policies. Because of the court's determination that Pierce is a named insured, a ruling by the court as to whether he is also properly considered an unnamed insured is unnecessary and the court sees no reason to reach this issue.

HARTFORD'S MOTION FOR SUMMARY JUDGMENT THAT IT HAS NO DUTY TO DEFEND PIERCE; PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ASKING THAT HARTFORD BE ENJOINED FROM TERMINATION OF DEFENSE OF PIERCE

■ Hartford has moved for summary judgment contending that it is under no obligation to continue defending any insured under policy 1262, including Pierce, on the basis that the duty of defense terminated at the time Hartford exhausted its primary policy limits. As noted with reference to this facet of Hartford's motion as it pertains to Tomlinson, the Texas district court has determined that endorsement six to the Tomlinson policy 1262 which changed the phrase "will defend" to "may defend" makes Hartford's defense obligations under that policy optional; however, that court enjoined Hartford to continue its defense of actions against Tomlinson which it has already undertaken unless specifically relieved of that obligation by Tomlinson's consent or by order of the court. As Pierce was not a party to the Texas litigation, the court will assume for present purposes that the judgment of that court has no preclusive effect as to the issues presented in this case relating to Pierce.

The question thus presented for consideration is whether Hartford is under a continuing obligation to defend Pierce under policy 1262. Pierce has responded to Hartford's motion regarding the scope and extent of Hartford's duty to defend and has in its own motion for partial summary judgment claimed that Hartford should be estopped to cease defending Pierce. Regarding Hartford's defense obligation, Tomlinson's primary policy states: "[T]he company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgment or settlement." The Republic and Tomlinson umbrella policies state that

the company "will (a) defend any suit against the insured seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient[.]" Endorsement six to each policy, though, changes the word "will," to "may." The language of the policies confirms Hartford's contention that endorsement six has the intended and actual effect of making Hartford's defense obligations under that policy optional, rather than mandatory.[40] Pierce claims, however, that as to him, the endorsement should be held inapplicable because as a mere third-party beneficiary of this insurance contract who was not involved in the negotiation or drafting of the policy and who was never provided with a copy of the policy, he could not possibly have known of the endorsement nor could he have known of Hartford's intent in inserting the "may defend" language of the endorsement. Hartford, he reasons, should be estopped to deny him a defense under any of its policies since he relied on the representations of the agents of Hartford and Tomlinson that he would be provided coverage under the Hartford policies. The court cannot accept this contention.

First, Pierce has taken the steadfast position in this litigation that he was an insured under the insurance contract at issue; by Pierce's own argument, therefore, he was not a mere third-party beneficiary to the policy but was instead an insured. Moreover, the proof demonstrates that while Hartford did treat Pierce as an insured under the Tomlinson primary and Republic excess policies, it did not consider Pierce an insured under policy 1262. In a March 31, 1986 letter to Pierce, Jim Napper, Hartford's claims manager, advised that Hartford's "coverage written for Tomlinson will be reformed to include Pierce Petro–Management." A subsequent letter to counsel for International from Napper advised that Pierce was "being added to

---

**40.** The court rejects Pierce's assertion that the language of endorsement six renders policy 1262 ambiguous.

the Tomlinson primary and Republic excess policy." No mention was made of the Tomlinson umbrella policy. But even if Hartford told Pierce that he would be covered under "Tomlinson's policies," it is nevertheless the case that the policy under consideration, policy 1262, does not make the provision of defense by Hartford mandatory, but rather optional. And even though Pierce may not have been provided a copy of the policy by Hartford, Pierce is nevertheless bound by its terms, including endorsement six. Thus, Hartford is not required to assume Pierce's defense under policy 1262.

■ To the extent that Hartford has already assumed Pierce's defense in presently pending actions, this court is in agreement with the conclusion of the Texas district court regarding Hartford's defense obligations to Tomlinson, that is, Hartford should not be permitted to terminate its defense of any claims against Pierce, which Hartford has already agreed to defend without either Pierce's consent or further order of the court because of the prejudice that would inure to Pierce otherwise. In the case of claims for which Hartford has not already undertaken to defend Pierce, Hartford should inform Pierce whether it will defend those claims within thirty days of Pierce's clear request for defense; in the event Hartford elects not to defend or is equivocal in its response to such request, Pierce should thereafter be entitled to negotiate the claim and seek coverage by Hartford for the settlement amount.

## PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ENTITLEMENT OF PIERCE TO ATTORNEY'S FEES AS AGAINST INTERNATIONAL

■ After International instituted this action on September 29, 1986 seeking, *inter alia,* a declaratory judgment that Pierce was not a proper insured under the Hartford policies, Pierce sought and was granted leave to intervene in the action. Upon intervention, Pierce asserted a counterclaim against International and a crossclaim against Hartford by which he sought an adjudication that he was an insured under the Hartford policies as well as the International policy. Pierce demanded that International reimburse him for attorney's fees incurred in this action and has moved for partial summary judgment on his request for attorney's fees. Pierce argues that as a result of International's bringing this action, Pierce was placed in a defensive position, facing possible loss of coverage, and was therefore required to intervene to protect his right to coverage, and in so doing, incurred needless legal expenses in litigating the issues of this case. Pierce claims, therefore, that he is entitled to recover attorney's fees from International.

In his motion for partial summary judgment, Pierce argues that International is liable under its policy for the costs incurred by Pierce in defending this action, and that his attorney's fees should be an element of damage to be factored into a judgment rendered pursuant to the Texas Deceptive Trade Practices Act and Texas Insurance Code. However, Pierce's complaint against International alleges only that he is entitled to attorney's fees by virtue of having been placed in a defensive posture by International.[41] There is no allegation or even a hint of the contractual or statutory basis upon which such an award might be predicated. The complaint does not allege that International violated the Texas Deceptive Trade Practices Act, or any other act, and it does not suggest the basis upon which a violation of these acts might be claimed; it merely states that International should pay Pierce's attorney's fees because it filed a suit which Pierce was required to defend.[42]

---

**41.** The complaint recites as follows:
Mission and Internation [sic] Insurance Companies should be required to pay attorney's fees for Intervenors Pierce, at the time that coverage is determined by the Court.
Mission and International should further be required to pay attorney's fees in this instant cause of action. If Mission, et al, had not filed this action, then Pierce would not have incurred attorney's fees in the defense of this action.

**42.** Plaintiffs argue, in the court's opinion somewhat disingenuously, that even if attorney's fees were available for merely having to defend an action such as this, Pierce would not be entitled

These Acts, therefore, can provide no basis for an award of attorney's fees. There is simply no basis in the pleadings for the determination Pierce requests, i.e., that attorney's fees should be an element of damage in a judgment for Pierce under the Texas Deceptive Trade Practices Act.[43]

In the court's opinion, Pierce is not entitled to recover attorney's fees from International for the defense of what is simply a declaratory judgment action by an insurer to determine its coverage obligations. Under Texas law, the court may in its discretion award attorney's fees for the defense of such actions. The court, however, declines to do so in the instant case. Neither before nor after bringing this action has International refused a request by Pierce for defense nor has it denied any claim presented by Pierce for payment. That is primarily because the present action for declaratory judgment was filed before any request was made by Pierce, and since the action has been filed, it has been determined that there remains coverage under Hartford's policies. Under the circumstances, there has been no breach by International of its insurance contract.[44] Moreover, in the particular circumstances of this case, even had International not brought this action, Pierce would have been in the position of establishing its coverage since Hartford had also denied that Pierce was insured under the Hartford umbrella policy. This fact has not escaped Pierce, who states in his motion for partial summary judgment on the coverage question that Hartford should be required to pay Pierce's attorney's fees for this action because, "[i]f Hartford had not asked this court to declare ... that it had no duties to Pierce in the circumstances of its conduct and policies, then Pierce would not have incurred attorney's fees in the defense of this action."

Based on the foregoing, therefore, the court finds that Pierce's motion for summary judgment seeking an adjudication of entitlement to attorney's fees against Interntional should be denied.

## PIERCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ENTITLEMENT TO ATTORNEY'S FEES AGAINST HARTFORD

In addition to his claim for attorney's fees against International, Pierce has alleged that he should be awarded attorney's fees against Hartford for having to defend this action and has moved for summary judgment on that issue. As with his claim against International, Pierce requests in his motion that this court adjudicate that attorney's fees be an element of damage to be factored in to a Deceptive Trade Practic-

to such an award since Pierce voluntarily and without any compulsion intervened in this action on his own. The court notes that since the issues presented by International's pleading primarily concerned Pierce's status as an insured under the Hartford policies, as well as International's policy, the court would likely have considered Pierce a necessary, if not indispensible party. That Pierce may have been required to intervene, though, is not dispositive of International's liability for attorney's fees for his having done so.

**43.** Pierce also suggests that International should be held accountable for Pierce's attorney's fees in this action as a sanction for maintaining an "unripe" action. *See* discussion of ripeness issue, *supra*. In this regard, the court observes that all of the issues raised by International were ripe for adjudication until the August 1989 ruling by Judge Barbour. Plaintiffs, in their first communication with the court following that ruling, a December 14 letter to the court, advised the court of their position that as a result of the ruling, the claims presented are not ripe for decision. Plaintiffs did not affirmatively pursue their claims, but merely responded to the motions of other parties, most notably, Pierce, and even in response to Pierce's motions, plaintiffs maintained their position that the issues were not ripe. Under these circumstances, sanctions are clearly not appropriate.

**44.** Pierce cites *Brickell v. United States Fire Insurance Co.,* 436 So.2d 797, 801 (Miss.1983) in support of his argument that attorney's fees should be awarded for his defense of this action. In that case, however, the court merely held that an insurer which breaches its duty to defend is liable for costs and attorney's fees incurred by the insured in defending himself. That is clearly not the situation here presented, for there was never a breach by International of a duty to defend and the fees sought by Pierce are not for his being required to defend himself against an action by a third party[ies], but rather for being required to defend this action for a coverage determination.

es Act judgment. Again, however, Pierce's complaint against Hartford does not assert a cause of action under that Act and therefore, does not provide a basis for recovery against Hartford of Pierce's attorney's fees. Pierce does not suggest any other basis for recovery of attorney's fees, other than his being placed in a "defensive posture" by Hartford's request for a determination that Pierce was not insured under policy 1262. That, alone, will not subject Hartford being required to pay Pierce's attorney's fees. The court is of the view that Pierce's motion for partial summary judgment as to entitlement to attorney's fees against Hartford should be denied.[45]

### Miscellaneous Matters Raised by Pierce

■ In its "supplemental brief in support of summary judgment against Hartford and supplemental response to Hartford's summary judgment motion," Pierce argues that Hartford paid out sums in settlement of Master Cause 15,002 on behalf of Murco Drilling and has failed to pursue its rights of contribution against Liberty Mutual Insurance Company, the insurance carrier which provided concurrent liability coverage for Murco. Pierce argues that Hartford should be held to have not exhausted or expended its primary coverage under policy 0639 because it failed in its obligation to protect the limits of that coverage by taking all necessary steps to exercise its right of contribution. And, because coverage under the primary policy would upon such ruling still be in effect, so, too, would the duty to defend under that policy. The court need not reach the merits of this claim by Pierce since this allegation finds no expression in Pierce's pleadings in this case, nor is it made the subject of any of the numerous motions by Pierce for partial summary judgment.[46] It appears, rather, only in a "supplemental" brief filed by Pierce.[47] The issue is, therefore, not properly before the court. In any event, in connection with this assertion, Pierce has presented no evidence of any kind that would tend to substantiate his contention that there even exists such "concurrent coverage" on behalf of Murco and has made no effort to present authority for its argument that Hartford should be held not to have expended its primary limits by virtue of its having allegedly failed to pursue some right of contribution.

Pierce also requests the court, in a letter brief dated March 22, 1991, to declare that policies 1261 and 1262 are coextensive policies which, insofar as Pierce (and Tomlinson) are concerned, coextensively stack as umbrellas above Tomlinson primary policy 0639.[48] Again, this "claim" is not asserted

**45.** That the court concludes that Pierce's motion should be denied does not dispose of Pierce's claim for attorney's fees. Pierce has alleged in his complaint against Hartford that Hartford "acted in bad faith, ... vexaiously [sic], wantonly, and for oppressive reasons" in failing to abide by the terms of its policies. Pierce's bad faith claim has not been made the subject of any motion for summary judgment, and the parties do not appear to dispute that attorney's fees are generally available for conduct which would support an award of punitive damages.

**46.** Pierce does allege in the crossclaim against Hartford that he attempted to solicit Hartford's participation in a suit against Pierce's liability insurance carrier, American General Fire and Casualty Company, and that Hartford refused to exercise any arguable subrogation right. The present assertion by Pierce regarding claims paid on behalf of Murco has no relationship to the allegation of the crossclaim. Regarding the crossclaim, the court would note that Pierce goes on to allege that on May 11, 1988, Hartford filed a claim in Hinds County Chancery Court against American General seeking contribution for sums paid in indemnification and defense on behalf of Pierce.

**47.** The court notes that Pierce's supplemental brief is the subject of a motion to strike by plaintiffs, who contend that the brief was filed by Pierce without authorization of the court. The court elects not to strike the brief, but certainly will not consider any new issues raised therein.

**48.** It is noted that the Texas district court found that policies 1261 and 1262 do not provide concurrent coverage and that amounts paid by Hartford "shall be paid and applied" as follows:

A. First, out of Tomlinson's primary liability policy, 61 CES SA0639, up to the policy's $600,000 limit;

B. Second, out of Republic's excess liability policy, 61 HUNV 1261, up to the policy's $1 million limit; and

C. Third, out of Tomlinson's excess liability policy, 61 HUNV 1262, up to the policy's $5 million limit.

in Pierce's pleadings, and he has not filed any motion pertaining to this issue.[49] The issue is, consequently, not properly before the court.

## UNDERWRITER'S MOTION FOR SUMMARY JUDGMENT AGAINST HARTFORD

■ The dispute between Underwriters and Hartford involves their respective liabilities under insurance policies which each issued to Tomlinson for Tomlinson's operations in the Johns Field. At the time of the blowout of the Ross # 2 Well, Tomlinson had in effect two certificates of insurance, numbers 35120 and 34595, issued by Underwriters to Tomlinson, Republic and Knostman, which provided well control and redrill/replacement coverage, respectively. After this litigation was commenced, Hartford moved for joinder of Underwriters and upon the court's granting Hartford's motion, Hartford asserted a crossclaim against Underwriters charging that certificate 35120 provided the primary coverage for Tomlinson's post-blowout evacuation expenses and that Underwriters were therefore liable to Hartford for all defense costs expended by Hartford on behalf of insureds as well as all insurance proceeds paid by Hartford to plaintiffs in settlement of Master Cause 15,002.[50] Alternatively, Hartford asserted that certificate 35120 provided at least concurrent coverage, thus rendering Underwriters liable for their pro rata share of defense costs and the amount of the settlement.[51]

Underwriters have moved for summary judgment contending that they had no duty to defend Tomlinson in Master Cause 15,-002 and that they have no duty to defend Tomlinson in Master Cause 15,445 because the allegations against Tomlinson in both lawsuits placed all claims within an exclusion from coverage. Underwriters further seek an adjudication that they are not responsible for payments Hartford made pursuant to the agreed judgment entered in Master Cause 15,002. The court concludes that the portion of Underwriters' motion for summary judgment which seeks a determination that Underwriters are not liable for sums paid by Hartford in settlement of Master Cause 15,002 should be granted. The remainder of Underwriters' motion should be denied.

Section C of the certificates at issue has been previously held by this court, as well as the Fifth Circuit, to provide coverage for the types of damages for which recovery was sought in Master Cause 15,002 and is sought in Master Cause 15,445.[52] *See Jones v. Southern Marine & Aviation Underwriters*, 739 F.Supp. 315 at 318 (S.D.Miss.1988) (coverage provided by Section C applies directly and unequivocally to types of damages for which state court plaintiffs sought recovery), *aff'd*, 888 F.2d

---

**49.** In Pierce's rebuttal brief to Hartford's reply to one of Pierce's motions for partial summary judgment, Pierce complains of Hartford's conduct in "[f]ailing to coordinate benefits under its policy with other policies" so that Hartford can "purport to deplete its reservoir of indemnification benefits, and thereby contend that it has exhausted its policy limits and deny its duty to defend." There is contained in Pierce's complaint nothing remotely resembling such an allegation and in any event, Pierce has nowhere explained the basis for any such claim.

**50.** Though not alleged by Hartford, nor set forth in any of the various filings by Hartford, the court assumes, at least for present purposes, that Hartford's efforts toward recovery of these costs is based on rights of subrogation or contribution.

**51.** As originally filed, Hartford's crossclaim sought a declaration that Underwriters are liable for any damages awarded to Tomlinson on their claims against Hartford and did not seek recovery of amounts paid in defense or settlement of Master Cause 15,002. The request for recovery of defense costs was included in Hartford's amended crossclaim filed in December 1988, and by subsequent amendment filed May 25, 1989, Hartford sought from Underwriters amounts paid in settlement of the state court action.

**52.** Both certificates provide as follows:

Underwriters, subject to the limitations, terms and conditions of this Certificate, agree to indemnify the Assured against or pay on behalf of the Assured:

(a) All sums which the Assured shall by law ... be liable to pay ... as damages for bodily injury (fatal or nonfatal) and/or loss of, damage to or loss of use of property caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination arising from wells insured....

358, 359 (5th Cir.1989) (damages alleged by plaintiffs were covered under Section C). Further provisions of the certificates at issue make Tomlinson's personal liability a condition precedent to coverage, and under the express terms of the agreed judgment entered in Master Cause 15,002, Tomlinson was relieved of any legal liability for the settlement.[53] In addition, the agreed judgment in Master Cause 15,002 was effected without the consent of Underwriters, despite a Cost and Appeals Clause in the certificates which provides that "[n]o settlement or losses by agreement shall be effected by the Assured without the consent of Underwriters where the Assured's final gross claim will exceed the retention of the Assured." The Fifth Circuit in *Jones* held that because Tomlinson is not personally liable under the agreed judgment, and the settlement was executed and the agreed judgment entered without Underwriters' consent, Underwriters could not be liable under Section C of the insurance certificates unless Underwriters breached a defense obligation to Tomlinson. The court further found, though, that the certificates "contain[ed] no provision contractually obligating Underwriters to defend Tomlinson against claims falling under policy coverage," and that "Underwriters could [not] have breached a duty to defend when their policy certificates did not impose a contractual duty to defend." *Id.* at 362. The court concluded that "[i]n the absence of a duty to defend, Underwriters should be able to enforce the policy provisions that make the agreed judgments not binding on them, thereby avoiding liability." *Id.* at 365. Accordingly, Underwriters' motion for summary judgment as it pertains to Hartford's claim for recovery from Underwriters of amounts paid on behalf of Tomlinson pursuant to the agreed judgment in Master Cause 15,002 should be granted.

■ Underwriters' request for summary judgment on Hartford's claim for de-

fense costs is premised on their contention that Underwriters were under no duty to defend because the allegations in the state court actions placed their claims within an exclusion from coverage. As the court expressed *supra,* on the question of whether Underwriters were or are under a duty to defend, there is no genuine issue of material fact; as a matter of law, they were and are not, since the certificates at issue impose no such obligation. But even though they breached no duty to defend Tomlinson, Underwriters have not, in the court's opinion, established that they can have no liability under the policy for the payment of defense costs. That is, the fact that Underwriters had and have no duty to defend Tomlinson is not determinative of the question whether Underwriters are responsible for all or a part of the costs of defense in connection with those actions. Each of the certificates issued by Underwriters provides as follows:

Underwriters, subject to the limitations, terms and conditions of this Certificate, *agree to indemnify the Assured against or pay on behalf of the Assured:*

. . . . .

(c) *Costs and expenses incurred in the defense of any claim or claims* and also costs and expenses of litigation awarded to any claimant, *against the Assured,* by way of interest on judgments, investigation, adjustment and legal expenses (excluding, however, all expenses for salaried employees and retained counsel of and all office expenses of the Assured).

In *Jones,* the Fifth Circuit concluded that this provision does not impose on the Underwriters a duty to defend Tomlinson, but rather "suggests that Tomlinson is responsible for conducting its own defense and Underwriters will merely pay the costs of such defense." *Id.* at 362. Thus, the certificates cover legal expenses as a loss item. Consequently, if the damages sustained by the state court plaintiffs do not fall within an exclusion from coverage such

---

53. The agreed judgment stated:

[T]his agreed Judgment shall not constitute a lien or encumbrance against the Estate in Bankruptcy of Tomlinson Interests, Inc., [or] Gary J. Knostman (individually or as Trustee of said Estate) . . . for their personal assets or

properties (real or personal) but shall constitute only a lien and encumbrance against any insurance coverages available to said Defendants which are applicable to the claims made in these causes, for which execution, garnishment, and other legal process may issue.

that Underwriters would be liable under the terms of the certificates for the loss, then defense costs would appear to be recoverable.[54]

■ Though not raised in the context of this particular issue, Underwriters maintain in this action that the claims of the state court plaintiffs are excluded from the coverage provided in Section C by virtue of the following language:

Insurance under this section does not cover:

d. Any claims arising directly or indirectly from seepage, pollution or contamination if such seepage, pollution, contamination ...

(ii) results directly from any condition which with the prior knowledge of any managing or supervisory personnel of the Assured is in violation of or noncompliance with any governmental rule, regulation or law applicable thereto....

Underwriters reason that since the state court plaintiffs, in both Master Causes 15,-002 and 15,445, took and take the position that Tomlinson, its agents and employees knowingly violated the Special Field Rules of the Johns Field adopted by the Mississippi Oil and Gas Board relating to required safety and preventative equipment, and that those violations proximately caused the blowout, then their claims are excluded from coverage. However, as this court has previously observed,

[w]hether there were any violations and whether the alleged violations of the special field rules of Johns Field by Tomlinson were proximate causes of the blowout were issues not litigated on the merits to a final decision in [Master Cause 15,002]; the agreed judgment was executed and terminated the state court litigation prior to adjudication of the merits.

*Jones,* 739 F.Supp. at 319. These issues obviously have not been resolved in Master Cause 15,445 which has not yet been tried. The record of Master Cause 15,002 reveals that trial testimony disputed the plaintiffs' claims that Tomlinson's violation of the special field rules caused the blowout, and in both state cases, Tomlinson disputed that it was guilty of any negligence, including violation of the field rules. In view of the existence of disputed issues of fact relative to the applicability of the exclusion upon which Underwriters rely, the question of coverage under the policy, including the question of Underwriters' liability for defense costs, may not be resolved by summary judgment.[55]

CONCLUSION

For the reasons expressed hereinabove, it is ordered that the various motions of the parties are granted and denied, respectively, as set forth herein.

APPENDIX A

United States District Court

Southern District of Texas

Civil Action No. H–87–2354

Case No. 84–03173–H2–4

Adversary No. 87–0024

In Re: Tomlinson Interests, Inc., Debtor.

Gary J. Knostman, Trustee for Tomlinson Interests, Inc.,

v.

Hartford Casualty Insurance Co., et al.

INTERLOCUTORY JUDGMENT

1. *Monetary Judgment.*

In the adversary proceeding in case A, Tomlinson Interests, Inc., recovers from

54. Underwriters appeared to have at one point suggested that because Tomlinson was provided a defense throughout Master Cause 15,002 by Hartford and Hartford continues to defend Tomlinson in cause number 15,445, Tomlinson has to date incurred no defense costs nor liability for defense costs and that therefore, such costs are not payable under the certificate. To the extent that this may have been or may be Underwriter's position, the court notes that this argument has not been pursued.

55. The court opined in *Jones* that plaintiffs' allegations in Master Cause 15,002 placed their claims within the exclusion from coverage. That statement by the court was dictum which the court, upon further consideration, believes was incorrect, or perhaps more precisely, inaccurate. It is the case that some of plaintiffs' allegations implicated the exclusion. However, plaintiffs made various allegations of negligence against Tomlinson other than the alleged violations of field rules which would bring Tomlinson within the coverage of the certificates.

Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company:

A. $68,538.28 in attorney's fees;

B. $7,700.00 in expenses;

C. $15,223.95 in prejudgment interest; and

D. Postjudgment interest at 6.21% per year.

2. *Declaratory Judgment.*

A. *Policy 61 HUNV 1262.* Republic Refining Company is a named insured under the policy, and any liability claims asserted against Republic arising from the blowout of the E.N. Ross No. 2 Gas Well are also covered by the policy.

B. *Proration.* Amounts paid by Hartford which fall within the coverage of any of these policies shall be paid and applied in this order:

(1) First, out of Tomlinson's primary liability policy, 61 CES SAO639, up to the policy's $600,000 limit;

(2) Second, out of Republic's excess liability policy, 61 HUNV 1261, up to the policy's $1 million limit; and

(3) Third, out of Tomlinson's excess liability policy, 61 HUNV 1262, up to the policy's $5 million limit.

C. *Policy 61 CES SA0642.* Republic's primary liability policy, 61 CES SA0642, remains in force, and Hartford shall pay claims and defend Republic as required by the terms of that policy, if claims are properly made against Republic under the policy.

D. *Duty to Defend.* Hartford may not cease to defend any claims against Tomlinson which Hartford has already agreed to defend, without either Tomlinson's consent or further order of this court. For claims in which Hartford has not already undertaken the defense of Tomlinson, Hartford shall inform Tomlinson whether it will defend those claims within 30 days of Tomlinson's clear request for defense.

Signed on February 19, 1991, at Houston, Texas.

/s/Lynn N. Hughes
Lynn N. Hughes
United States District Judge

## OPINION ON INTERLOCUTORY JUDGMENT

The court will adopt the findings of fact and conclusions of law and judgment entered by the bankruptcy court, except as now modified.

1. *Policy 61 HUNV 1262.*

Hartford Casualty Insurance Company and Hartford Accident and Indemnity Company (collectively Hartford) are estopped from denying that policy 61 HUNV 1262 applies to covered losses and liabilities of Tomlinson Interests, Inc., arising from the blowout of the E.N. Ross No. 2 Gas Well located in the Johns Field in Rankin County, Mississippi.

Although the bankruptcy court's judgment contains excess language, it requires Hartford only to defend claims for losses and liabilities arising from the blowout of the E.N. Ross No. 2 Gas Well, subject to the coverage limitations in policy 61 HUNV 1262. Hartford shall pay Tomlinson's losses and liabilities arising from the blowout of the E.N. Ross No. 2 Gas Well to the extent that those losses and liabilities fall within the coverage of policy 61 HUNV 1262. Republic Refining Company is a named insured under the policy, and any liability claims asserted against Republic arising from the blowout of the E.N. Ross No. 2 Gas Well are also covered by the policy.

2. *Proration.*

There was no basis for the bankruptcy court's proration between the policies. Hartford is not required to prorate amounts paid on behalf of Tomlinson under policy 61 HUNV 1261 and policy 61 HUNV 1262. Instead, amounts paid by Hartford which fall within the coverage of any of these policies shall be paid and applied in this order:

A. First, out of Tomlinson's primary liability policy, 61 CES SA0639, up to the policy's $600,000 limit;

B. Second, out of Republic's excess liability policy, 61 HUNV 1261, up to the policy's $1 million limit; and

C. Third, out of Tomlinson's excess liability policy, 61 HUNV 1262, up to the policy's $5 million limit.

### 3. *Policy 61 CES SA0642.*

Republic's primary liability policy, 61 CES SA0642, remains in force, and Hartford shall pay claims and defend Republic as required by the terms of that policy, if claims are properly made against Republic under the policy.

### 4. *Hartford's Duty to Defend.*

The provision in Tomlinson's excess liability policy, 61 HUNV 1262, entitled, "Investigation, Defense, Settlement" was changed by endorsement to provide that Hartford "may defend any suit ... against the insured." The court finds that "may" means may, not must. This endorsement gives Hartford the option, but not the duty, to defend Tomlinson. Hartford has been defending liability claims against Tomlinson since 1985 and has advised the court that it will continue to defend those claims. Hartford may not cease to defend any claims against Tomlinson which Hartford has already agreed to defend, without either Tomlinson's consent or further order of this court.

For claims in which Hartford has not already undertaken the defense of Tomlinson, Hartford shall inform Tomlinson whether it will defend those claims within 30 days of Tomlinson's clear and unambiguous request for defense. An equivocal response by Hartford will be considered a refusal to defend, entitling Tomlinson to negotiate the claim and seek coverage by Hartford for the settlement amount.

### 5. *Attorney's Fees.*

Although Mississippi law applies to determine Tomlinson's liability for the blowout, Texas law applies to determine the rights and obligations of Tomlinson and Hartford under the policies, including Tomlinson's right to attorney's fees. The court will affirm the bankruptcy court's judgment in its award of attorney's fees.

If the attorneys cannot agree on the amount of attorney's fees and expenses incurred since the entry of the bankruptcy court's judgment, the court will determine the amount at a later date.

Signed on February 19th, 1991, at Houston, Texas.

/s/Lynn N. Hughes
Lynn N. Hughes
United States District Judge

## APPENDIX B

United States District Court

Southern District of Mississippi

Jackson Division

Civil Action No. J87–0132(B)

Stephen T. Jones, et al., Plaintiffs

v.

Tomlinson Interests, Inc., Republic Refining, Ltd., and Gary J. Knostman, Trustee, Intervenors

v.

Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company, Defendants

### BENCH OPINION

BEFORE: The Honorable WILLIAM H. BARBOUR, Jr., United States District Judge

DATE: August 25, 1989

PLACE: Jackson, Mississippi

APPEARANCES:

COUNSEL FOR PLAINTIFFS:
Mr. Charles G. Copeland
Mr. Wilburn Hyche

COUNSEL FOR INTERVENORS:
Mr. Christopher A. Shapley

Ms. Leigh Elizabeth Roberts

COUNSEL FOR DEFENDANTS:

Mr. Lawrence C. Gunn, Jr.

Mr. Robin L. Roberts

COURT REPORTER:

Ms. Celeste O. McClelland, RPR

THE COURT: The Court first is going to announce in regard to Exhibits D–79 and P–86–A that the Court is going to overrule the objections to those and admit those into the record. One of them is an addition to a deposition, the other to a transcript, although both of them may be depositions. Just designations of further parts of those depositions.

(Exhibit Number D–79, P–86–A marked for identification.)

THE COURT: The Court has considered the evidence in this case consisting of the testimony and exhibits introduced into the record, has considered a number of arguments of counsel which discussed various points during the course of the trial. Counsel have waived closing arguments.

The Court is now prepared to render its findings of fact and conclusions of law by way of this bench opinion. In the event this bench opinion is later transcribed for appeal or other purposes, the Court reserves the right to edit or amend it, however, such editing or amending will not change the result of the decision.

The Court will not try to distinguish the various entities of the parties in this lawsuit.

Tomlinson Interests consists of a number of related corporations and/or partnerships. It is an oil producer.

Republic Refining, Limited, also consists of a number of related entities and will be referred to as Republic. Republic owned and operated a hydrogen sulfide extraction plant in Rankin County, Mississippi, which was used to extract the hydrogen sulfide from certain deep gas wells which were drilled and operated by Tomlinson Interests in the Johns Field in Rankin County, Mississippi.

Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company were insurers of Tomlinson and Republic and will be referred to as Hartford in this opinion.

The Plaintiffs, Stephen T. Jones, et al., were landowners in and around the area where the E.N. Ross Number 2 deep gas well was drilled by Tomlinson in Rankin County, Mississippi. On July 15, 1985, the Ross Number 2 well blew out causing the spread of the highly toxic hydrogen sulfide gas, or sour gas as it is sometimes referred, in the area with resulting property damage of a substantial nature to the Plaintiffs and others.

The Plaintiffs recovered a judgment in the Circuit Court of Rankin County, Mississippi, against Tomlinson by way of a trial and settlement before a jury verdict. That settlement agreement provided basically for a liability assessment of $1,665,283 of which Hartford paid all but $600,000. The $600,000 balance bears interest at the rate of 8 percent per annum from October 22, 1986.

The Plaintiffs brought this action to collect the balance of that judgment against Hartford claiming that Hartford's policy which was, and is, an excess liability umbrella policy was, and is, applicable. That Policy Number is 61 HUNV 1262 and is the policy at issue in this lawsuit.

Tomlinson Interests, Republic Refining, and Gary Knostman as trustee in bankruptcy for Tomlinson and Republic intervened in this action because of the additional interest that they had in asserting that this particular liability umbrella policy was applicable to losses which Tomlinson and Republic had sustained as a result of this well blowout including other claims in addition to this $600,000 claim presented by Plaintiff Jones, et al.

The issue presented to the Court is fairly simple. That issue is whether Hartford has proved by clear and convincing evidence that Policy Number 61 HUNV 1262 should be reformed to exclude liability coverage of the wells in Johns Field because there was a meeting of the minds between Tomlinson and Hartford to exclude the wells contained in that field at the time that the policy was written.

Although the issue is simple, the evidence has been complex and the decision of the Court deals with a $5,000,000 insurance policy for which Hartford would be liable if the Court found for the Plaintiff and the Intervenors.

The Intervenors Tomlinson and Republic operated the gas well and refinery in Rankin County, Mississippi. Republic's partners, other than Tomlinson, as early as 1982, required liability insurance in the minimum amount of $150,000,000. Both Republic and Tomlinson were insured by primary liability policies written by Twin Cities Insurance Company for the policy years October 1, 1982, through October 1, 1983, and October 1, 1983, through October 1, 1984.

Hartford had written excess liability or umbrella policies in addition to these primary policies for both Republic and Tomlinson. When the amount of insurance was increased, Mr. Graves, an attorney on the staff of Tomlinson and Republic, consulted with Robert Hixon, an insurance agent with the Wortham Agency of Houston, Texas, to decide how to increase the umbrella coverage so that the Republic interest owners could be satisfied in regard to the $150,000,000 limits.

In discussing this problem, those two persons mutually came up with the idea that since the refinery operated by Republic (in fact, it's referred to as a refinery but it's really an extraction plant) operated only in Rankin County, Mississippi, and pertained only to Tomlinson's four wells in the Johns Field, that the agent could sell to the underwriters for Hartford or some other excess carrier the idea that those wells were an integral part of the extraction plant owned by Republic and that Republic's excess line could be written so that Tomlinson was an additional named insured under that line without Tomlinson having to buy an additional $150,000,000 worth of insurance on the wells themselves.

This was worked out and the lines of insurance were prepared in such a manner that for the policy years 82/83 and 83/84, the Republic excess line of insurance provided that Tomlinson was an additional named insured insofar as the Rankin County wells were concerned. The Tomlinson excess line was written in such a way as to exclude the Rankin County wells from the risk of the excess carriers.

Accordingly, through the preparation of the 1983/84 policies, the parties, Tomlinson and Hartford, agreed that the wells in Rankin County should be excluded from the excess line coverage of Tomlinson.

During mid policy year 1983/84, Hartford began writing a different policy which would provide Tomlinson with greater protection for pollution damage. As a result, on April 5, 1984, Tomlinson and Republic replaced the Twin Cities primary policies with primary policies written by Hartford and then replaced the Hartford umbrella policies with new Hartford umbrella policies which provided this expanded environmental protection coverage.

At that time, April 5, 1984, the Tomlinson excess policy did not include a written endorsement excluding the operations in the Johns Field from the operation of those excess policies. The Republic excess policy written by Hartford still included the Johns Field operations through the naming of Tomlinson as a named insured.

Accordingly, for the policy period April 5, 1984, through October 1, 1984, there was double coverage in regard to the excess liability in that both the Republic and Tomlinson policies written by Hartford covered the risk in the Johns Field in Rankin County.

Thereafter, when those policies expired, there was a request by Tomlinson and Republic for a renewal of those policies on the same terms and conditions for an additional year beginning October 1, 1984. Those policies were renewed on the same basis without an exception so that again there was double coverage.

This situation did not come to the attention of Tomlinson or Republic until after the well blowout in July of 1985. In fact, it did not become important until several months after the blowout because Tomlinson felt that it had $150,000,000 of excess coverage available to cover any liability

that it had because it was named as an additional named insured under the Republic excess line.

Problems arose when one of the major excess carriers for Republic, Mission Insurance Company, went *into* receivership, thereby as a practical matter deleting that source of funds for payment of any liabilities that Tomlinson might have because of well blowout.

Apparently the parties were not aware of this until approximately the time of the agreed settlement with the Plaintiffs in this case in the Rankin County case.

After considerable skirmishing, changing of positions, and discovery in the bankruptcy matter, Hartford took the position that the policy under consideration in this case should have had an endorsement excluding Tomlinson's operations in the Johns Field as a risk. Through this lawsuit, Hartford has taken the position that the policy should be reformed because of the alleged mutual mistake between Tomlinson and Hartford in the writing of the policy.

Hartford has produced a substantial volume of evidence by way of correspondence, prior insurance policies, and testimony that Tomlinson intended for the coverage under the policy in question to be the same as it had obtained under the 82/83 policies and the policies which remained in effect from October 1, 1983, to April 5, 1984.

Hartford, in effect, takes the position that its underwriters made a mistake in issuing the April 5, 1984, excess liability policy to Tomlinson in failing to exclude the Johns Field risk when it was clearly included under the Republic umbrella policy, and that it continued with this same mistake in regard to the 84/85 policies.

The Plaintiffs and the Intervenors, understandably enough, take the position that the Defendant Hartford has not proved that there was a mutual mistake, although they tacitly concede that there was a mistake made in the issuance of this policy without the endorsement.

In support of its position, Hartford basically relies on the past experience and on various statements and positions taken after the loss by the people with the Wortham Agency and Hartford itself. In fact, after the loss was incurred, Hartford sent a proposed endorsement to the trustee in bankruptcy for execution, that endorsement being to the effect that the risk would be excluded from the policy. That endorsement was forwarded through the Wortham Agency and after it arrived at the Wortham Agency, Hartford, by telegram or telex, retrieved the endorsement saying that it didn't intend to present it to the insured. Thereafter, it changed its mind and forwarded the endorsement again to the insured. The trustee in bankruptcy refused to sign the endorsement at that time.

There are other instances in the record where Hartford took contrary positions in regard to what coverages were available, what coverages applied to these losses and whether or not the Policy 1262 applied or not.

Basically, the Court sees the issue as a fairly close one as to what the true intent of the parties were. The insurance company Hartford has alleged that the intent of Tomlinson has been expressed on a number of occasions by the Wortham partner, Robert Hixon. Mr. Hixon's testimony on cross-examination was that the intent that he had expressed was that of Wortham and Hartford, not necessarily that of Tomlinson.

Hartford's position, when boiled down to the simplest argument that it makes, is that the parties made a mistake in April of 1984, and that that was a mutual mistake; that Tomlinson intended to replace its old umbrella policy with the new policy providing greater environmental protection; and that the Johns Field risk was not being covered by the Tomlinson excess policy but was being covered by the Republic excess policy; that that was an admitted mistake by the underwriters of Hartford and that that simply was a mistake that was carried through to the 1984/1985 policy in question.

On the other hand, the record shows that Mr. Graves, as the person at Tomlinson in charge of obtaining insurance, had on a

number of occasions consulted with Mr. Hixon as to whether Tomlinson could be named as an additional insured under the Republic policy and still obtain additional excess coverage under its own excess limits for the Johns Field. Mr. Hixon simply replied to him that, in effect, the underwriters would not accept this type of double exposure and left it at that. The underwriters, however, did accept it, although by mistake on their part. And the question is whether the Defendant Hartford under all of the evidence in the case has shown by clear and convincing evidence that there was a mutual intention to exclude the Johns Field risk from the Tomlinson excess line policies.

After considering the conflicting evidence in the case, the Court finds that the Defendant Hartford Insurance Company has not proved by clear and convincing evidence that there was a mutual mistake in failing to exclude the Johns Field risk from Policy Number 61 HUNV 1262.

Accordingly, the Court concludes that the Plaintiffs Jones, et al., are entitled to a judgment against Hartford in the sum of $600,000 plus interest at the rate of 8 percent from October 22, 1986; and that the Intervenors, Tomlinson, Republic, and Knostman as trustee, are entitled to a declaratory judgment that Policy Number 61 HUNV 1262 covers any liability that Tomlinson Interests has growing out of the blowout of the Ross Number 2 well on July 15, 1985.

This will conclude the findings of fact and conclusions of law.

Are there any requests for additions or clarifications to this bench opinion?

MR. SHAPLEY: No, Your Honor.

MR. COPELAND: No, Your Honor.

MR. GUNN: Your Honor, I'm sitting here trying to think whether that can be made in a post-trial motion or not. I'd like an opportunity, frankly, to study the transcript before I decide whether to request any additional findings of fact. I don't have the rule in front of me to know if I have that luxury or not.

THE COURT: I don't know whether you have the right under the rules to request anything additional or not. I was merely extending that courtesy to clarify anything that you might misunderstand about the Court's ruling.

MR. GUNN: I can't think of anything right now.

THE COURT: Certainly by making this comment I don't mean to bind you, Mr. Gunn, as far as any appeal rights are concerned.

MR. GUNN: Oh, certainly.

THE COURT: It would not be my intention by making that inquiry to be attempting in any way to limit the appeal rights or rights that Hartford might have for reconsideration or anything else along that line.

MR. GUNN: Thank you, Your Honor.

THE COURT: All right. This will conclude the bench opinion of the Court. It will conclude this matter as of this time.

I will ask that Mr. Shapley and Mr. Copeland prepare appropriate judgments. You can consult with Mr. Gunn as to whether you suggest that separate judgments be entered. I do not have an opinion right now but I will be glad to consult with you if you find it necessary.

Otherwise I would appreciate your preparing a judgment or two judgments in conformance with this bench opinion. Please state in the judgment that a bench opinion was rendered so that it might be clear to the appellate Court that the Court did make findings of fact and conclusions of law.

MR. SHAPLEY: Yes, Your Honor.

THE COURT: All right. If there is nothing further then, the attorneys and parties in this case may be excused.

(Recess.)

## CERTIFICATE

I, Celeste O. McClelland, Registered Professional Reporter, United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing 13 pages contain a full, true, and correct transcript of the proceedings had in

the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

This the 28th day of August, 1989.

/s/ Celeste O. McClelland
Celeste O. McClelland

My Commission Expires:

June 29, 1991

## FINAL JUDGMENT

### Filed Aug. 31, 1989

THIS action having come on for trial by the Court, all parties having agreed to waive a jury and to submit all fact issues to the Court as the trier of fact, and the Court having considered the evidence presented by all parties and having heard the argument of counsel and the Court having rendered a bench opinion in this matter setting forth specific findings, and the Court having found in favor of the Plaintiffs, Stephen T. Jones, et al. and the Intervenors, Tomlinson Interests, Inc., et al.;

IT IS ORDERED AND ADJUDGED, that the Plaintiffs, Stephen T. Jones, et al. recover of the Defendants, Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company, the sum of $600,000 principal plus $139,002.74 of interest, being 8 per cent per annum from October 2, 1986 through August 25, 1989, plus interest at 8 per cent per annum on $600,000 from August 25, 1989 until paid together with allowable costs in this action, for all of which execution and other legal process may issue.

SO ORDERED this the 31st day of August, 1989.

s/ William H. Barbour, Jr.
UNITED STATES DISTRICT JUDGE

## APPENDIX C

In the United States Court of Appeals

for the Fifth Circuit

No. 89–4750

Summary Calendar

Stephen T. Jones, et al.,
Plaintiffs–Appellees,

and

Tomlinson Interests, Inc.,
Intervenor–Appellee,

v.

Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company, Defendants–Appellants.

Appeal from the United States District Court for the Southern District of Mississippi (CA–J87–0132(B))

(March 28, 1990)

Before REAVLEY, KING and JOHNSON, Circuit Judges.

PER CURIAM:[1]

Tomlinson Interests, Inc. ("Tomlinson") operated the E.N. Ross # 2 Well located in the Johns Field in Rankin County, Mississippi. A subsidiary of Tomlinson's, Republic Refinery, Ltd. ("Republic"), operated a gas plant nearby. On July 15, 1985, the Ross # 2 Well blew out causing damage to surrounding surface owners. The surface owners sued Tomlinson for damages in the Circuit Court of Rankin County. An agreed judgment was entered against Tomlinson in the amount of $1,665,283. Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company (collectively "Hartford"), Tomlinson's insurer, paid $1,065,283 of this amount. Hartford denied liability as to the remaining $600,000.

---

1. Local Rule 47.5 [47.5.1] provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the court has determined that this opinion should not be published.

The surface owners filed a garnishment action in Rankin County to obtain the $600,000 balance on the agreed judgment against Hartford. Hartford removed the action to the United States District Court. Tomlinson, Republic, and Gary J. Knostman, as bankruptcy trustee for Tomlinson and Republic, intervened as plaintiffs claiming that Tomlinson's policy, issued by Hartford, covered the balance of the unsatisfied judgment.

There is no dispute regarding the validity of the agreed judgment nor garnishment as a proper means of recovery. Hartford, however, contends that a mistake was made in issuing the Tomlinson policy and that this policy should be reformed to exclude the Johns Field from its coverage.

Following three days of testimony, the district court ruled that Hartford was not entitled to reformation of the policy. Hartford takes this appeal. We affirm.

## I.

Tomlinson's Johns Field operations were potentially hazardous and presented a large liability exposure because the wells were high pressure, produced sour gas and were close to Jackson, Mississippi. The working interest owners in the wells and the Republic gas plant required Tomlinson and Republic to purchase $150,000,000 of insurance on the Johns Field and the plant to cover the large exposure that they presented. Tom Graves, an attorney responsible for insurance at Tomlinson and Republic, contacted John L. Wortham and Son Insurance Agency ("Wortham") in Houston about placing coverage on the Field.

Beginning in 1982, Wortham, an insurance brokerage, sold aggregate coverage for Republic of $150,000,000 and aggregate coverage for Tomlinson of $15,000,000. Hartford was the primary insurer for both Republic and Tomlinson. A Hartford affiliate, Twin Cities, provided the next layer of insurance coverage (umbrella) for both Tomlinson and Republic. After these Hartford and Twin Cities policies, other companies provided additional layers of excess coverage to reach the aggregate amount of coverage for each entity.

Graves worked with Robert Hixon at Wortham in designing appropriate coverage for Tomlinson and Republic. Each company maintained its own primary liability policy. Tomlinson was then added as an additional insured on the Republic policy beginning at the umbrella layer issued by Twin Cities. At the same time, Tomlinson's Johns Field operations were excluded from the Tomlinson insurance program beginning at that same umbrella layer. The result was that Tomlinson's Johns Field was insured only under the Republic policy at the umbrella coverage level.

During 1984 Hartford began offering a new policy that provided greater protection for pollution damages. Tomlinson replaced its primary policy with this new "expanded coverage" policy written by Hartford. Tomlinson also replaced its Twin Cities umbrella policy with a new Hartford umbrella policy. The new Hartford umbrella policy for Tomlinson became effective in April of 1984 and continued until October of that same year. As written, this new Tomlinson policy *did not* exclude the Johns Field from its coverage as the previous policy had.

When the Tomlinson and Republic policies expired on October 1, 1984, the insureds requested that the policies be extended for an additional year. The policies were extended as requested and included the same terms that were found in the policies in October of 1984—that is, Tomlinson's Johns Field was added to the coverage of the Republic policy, but *was not* excluded from the Tomlinson policy. The Johns Field was insured under both policies.

Following the well blow-out, the insurer providing the second layer of insurance for Republic, Mission National Insurance Company, was in receivership. The surface owners and Tomlinson, therefore, looked to the Hartford umbrella policy issued to Tomlinson as co-insurance for that layer of coverage. Hartford paid $1,065,283 of the agreed judgment. Hartford denies liability

under the Tomlinson umbrella policy for the remaining $600,000.

Hartford admits that the Tomlinson policy as written does not exclude the Johns Field from its coverage. However, Hartford claims that it is not liable because a mistake was made in preparing the insurance contracts. According to Hartford the parties intended to exclude the Johns Field from the Tomlinson policy at the umbrella level. Due to a mistake, however, the Johns Field was not excluded. Hartford claims that because of this mistake, the written contract should be reformed to reflect the intent of the parties.

Tomlinson claims that they intended for the Johns Field to be insured under the Tomlinson policy and that the Tomlinson policy as written accurately reflects their intent. Because there was no mutual mistake, Tomlinson argues that reformation is not available as a remedy to Hartford.

## II.

Reformation is an equitable remedy available only where the party seeking it proves by clear and convincing evidence that the writing to be reformed does not accurately reflect the intent of the parties. *See First Nat'l Indem. Co. v. Conway,* 495 S.W.2d 11, 15 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *see also Hartford Fire Ins. Co. v. Associates Capital Corp.,* 313 So.2d 404, 408 (Miss.1975); J. Calamari & J. Perillo, *The Law of Contracts* § 9-31, at 311-13 (2d ed. 1977). The written instrument is reformed to reflect the agreement that was reached by the parties; the agreement itself is not reformed. *See id.* at 312; *Conway,* 495 S.W.2d at 15. To reform a writing, the party seeking the remedy must show the true agreement of the parties and prove that, due to a mutual mistake, the subsequent written instrument does not reflect that agreement. *See id.* There is a presumption that the written instrument does, in fact, reflect the parties' intended agree-

ment. *Champlin Oil & Ref. Co. v. Chastain,* 403 S.W.2d 376, 382 (Tex.1965). The party seeking the remedy has the burden of proving by clear and convincing evidence that the writing does not reflect the intent of the parties. *Hartford Fire Ins. Co.,* 313 So.2d at 408; *see Aetna Ins. Co. v. Paddock,* 301 F.2d 807, 810-11 (5th Cir.1962). Determining the parties' intent is a matter for the trier of fact, *see Great Atl. Ins. Co. v. Liberty Mut. Ins. Co.,* 773 F.2d 976, 982 (8th Cir.1985) (Bright, J., dissenting), that is to be reviewed by this court under the clearly erroneous standard.[2]

In its Bench Opinion, the trial court characterized the question before it as, "whether the Defendant Hartford under all of the evidence in the case has shown by clear and convincing evidence that there was a mutual intention to exclude the Johns Field risk from the Tomlinson excess line policies." The court saw "the issue as a fairly close one as to what the true intent of the parties" was. After considering the evidence presented by the parties, the court found that Hartford failed to carry its burden of proving a mutual intent to exclude the Johns Field from the Tomlinson excess line.

Our review of the record confirms the trial court's view that the issue of intent was a close one. The evidence was conflicting and contradictory. Tom Graves, who managed the insurance for Tomlinson and Republic, testified that Tomlinson wanted the Johns Field to be covered by the Tomlinson policy. From April of 1984 until the well blow-out, Tomlinson, in fact, believed the Johns Field was covered by the Tomlinson policy as well as by the Republic policy. Graves testimony is supported by the language of the insurance contracts as well as other inferences that can reasonably be drawn from the evidence.

Hartford presented evidence showing that the parties did not intend to include the Johns Field in the Tomlinson policy. Undeniably, before April of 1984, the Johns

---

**2.** Hartford casts the issue on appeal as a legal one. Reading the trial court's Bench Opinion in its entirety, we conclude that the court understood the law and made no error in its application.

Field was excluded from the Tomlinson policy at the disputed level of coverage. Hartford insists that the reason the Johns Field remained on the Tomlinson policy issued in April of 1984 was because of a mistake on the part of its underwriters. The trial court acknowledged that the underwriters made a mistake. However, a mistake on the part of one of the parties to a contract will not support a reformation. *See Hartford Ins. Co.*, 313 So.2d at 408. What Hartford was required to prove by clear and convincing evidence was that the parties reached " 'a definite and explicit agreement, understood in the same sense by both, but, by their mutual ... mistake, the written contract fails to express this agreement.' " *Chastain*, 403 S.W.2d at 382 (quoting Black on Rescission and Cancellation, § 11); *Conway*, 495 S.W.2d at 15; *see United States Fidelity & Guar. v. Gough*, 289 So.2d 925, 927 (Miss.1974). In other words, to be entitled to have the written instrument reformed, Hartford had to show that both Tomlinson and Hartford mutually agreed to exclude the Johns Field from the Tomlinson policy and that this mutual intention was not reflected in the writing.

We do not believe the trial court clearly erred in finding that Hartford failed to prove by clear and convincing evidence that there was no mutual intention to exclude the Johns Field from the Tomlinson policy. The Tomlinson policy, as written, reflected Tomlinson's intent, according to Graves. Hartford was burdened with overcoming the presumption that the writing accurately reflected the intent of the parties. *Chastain*, 403 S.W.2d at 382. Hartford failed to prove by clear and convincing evidence that there was a definite agreement between the parties that was different from the agreement expressed in the written instrument. *Conway*, 495 S.W.2d at 15. While "[t]he issue could have been decided either way, [Hartford] lost the reformation battle before the trier of facts and the arbiter of credibility." *Paddock*, 301 F.2d at 811. The trial court did not clearly err in finding that there was no

mutual intent to exclude the Johns Field from the Tomlinson umbrella policy.

Hartford also contends that Wortham was Tomlinson's agent and that the intent of Tomlinson was expressed through Wortham as its agent. The court found that the intent as expressed by Mr. Hixon, a Wortham partner, "was that of Wortham and Hartford, not necessarily that of Tomlinson." The question of agency is one of fact, *see Foundation Reserve Ins. Co. v. Wesson*, 447 S.W.2d 436, 438 (Tex.Civ. App.—Dallas 1969, writ ref'd), and as such is reviewed under the clearly erroneous standard. The trial court's finding as to agency and its bearing on the issue of intent is not clearly erroneous and will not be disturbed.

AFFIRMED.